**TRUSTEES OF the UNIVERSITY OF the DISTRICT OF COLUMBIA, Appellants,**

v.

**Jafar VOSSOUGHI, Appellee.**

No. 05–CV–1165.

District of Columbia Court of Appeals.

Argued May 23, 2007.

Decided Jan. 15, 2009.

Mary T. Connelly, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Linda Singer, Attorney General for the District of Columbia at the time, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General at the time, were on the briefs, for appellants.

Jonathan C. Dailey, Washington, with whom Robert C. Kostecka was on the brief, for appellee.

Before WASHINGTON, Chief Judge, GLICKMAN, Associate Judge, and FARRELL, Associate Judge, Retired.[*]

GLICKMAN, Associate Judge:

Dr. Jafar Vossoughi sued the University of the District of Columbia ("UDC") for destroying his personal property—unique scientific instruments and other equipment, voluminous teaching materials, unpublished research data, and other items—when it cleaned out his biomechanical research laboratory without his knowledge in order to devote the space to other uses. The case was tried to a jury, which found

---

[*] Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

UDC liable to Dr. Vossoughi for trespass to chattel, conversion, and negligence, and awarded him compensatory damages in the amount of $1,650,000. The trial court entered judgment on that verdict and denied UDC's post-judgment motion for partial judgment as a matter of law, a new trial, and/or a remittitur.

On appeal, UDC takes no issue with the jury's finding of liability and seeks a new trial only on the question of Dr. Vossoughi's damages. To prove the value of his lost property at trial, Dr. Vossoughi relied on his own testimony and that of two expert witnesses. UDC, which introduced no contrary valuation evidence, challenges both the admissibility of the experts' testimony and the overall sufficiency of Dr. Vossoughi's proof of value. In addition, UDC claims that the trial court improperly refused to instruct the jury on mitigation of damages and erroneously allowed the jury to award damages to Dr. Vossoughi for property that belonged not to him, but to UDC.

UDC's contentions do not persuade us to grant it relief. We conclude that the valuation testimony of Dr. Vossoughi and his two expert witnesses was admissible and sufficient to support the jury's award. We further conclude that UDC was not entitled to an instruction on mitigation. Finally, we reject UDC's charge that the trial court erroneously allowed the jury to compensate Dr. Vossoughi for the loss of property he did not own.

## I.

Dr. Vossoughi is an expert in applied mechanics and experimental biomechanics—an area of study that encompasses the testing of mechanical theories and the creation and development of novel experimental devices for biomechanical research. Over the course of his career, Dr. Vossoughi has written or edited 17 books and over 150 other publications. According to the undisputed testimony of two fellow scientists, Dr. Vossoughi has made significant discoveries and contributions and is well-known and respected in his academic field.

Dr. Vossoughi received his professional training at Catholic University in the District of Columbia. After earning his bachelor's degree in mechanical engineering, and then a master's degree in civil engineering in 1976, Dr. Vossoughi remained at Catholic University until 1989, when he received his Ph.D. in applied mechanics. Dr. Vossoughi began teaching engineering courses at Catholic University while he was still an undergraduate, and he continued teaching as a graduate student. In the process, he created comprehensive materials and notes for a total of twenty courses in engineering or architectural subjects. He also conducted independent, grant-funded research at Catholic University in addition to the research for his doctoral thesis.

In 1989, UDC hired Dr. Vossoughi as an adjunct associate professor, and he established a laboratory there. When he left Catholic University, Dr. Vossoughi brought with him to UDC his on-going research and course materials and the equipment he utilized in his laboratory work. Much of this material belonged to Catholic University, but the university allowed Dr. Vossoughi to take it with him. Uncontradicted testimony at trial established that universities normally (if not invariably) permit researchers who move to other academic institutions to take their laboratories and equipment with them, because specialized scientific devices and other research or teaching materials may be of most value in the hands of the principal investigator utilizing them. It is undisputed that Catholic University disclaimed the equipment and intellectual property Dr. Vossoughi brought with him to UDC in

1989, and that Dr. Vossoughi thereafter was the rightful and sole owner of that property.

For several years, UDC renewed Dr. Vossoughi's employment contract annually. In 1995, however, UDC informed Dr. Vossoughi that his position would need to be supported entirely by grant or contract funds from external sources. After Dr. Vossoughi's final employment contract with UDC ended in 1997, he was allowed to remain on campus and support his research laboratory there through public or private grants. Under federal regulations and National Science Foundation policy, which were introduced in evidence at trial, such research grants are awarded to a recipient institution, and title to grant-funded property vests in the institutional grantee. As UDC grant administrator Joan Levermore explained, property that Dr. Vossoughi acquired or developed with grant funds during his tenure at UDC therefore belonged to UDC, not to Dr. Vossoughi. While UDC might have allowed Dr. Vossoughi to keep some or all of this property upon his departure from the institution, it was under no obligation to do so.

In 1999, Dr. Vossoughi filed a lawsuit against UDC for breach of contract, in which he claimed that university officials had reneged on a promise to give him tenure. In the summer of 1999, while settlement negotiations were taking place, acting UDC provost Beverly Anderson directed Dr. Vossoughi in writing to vacate his laboratory, because the space was needed for other university programs. In early September, however, UDC counsel Robin Alexander advised Dr. Vossoughi's attorney that Dr. Vossoughi's eviction had been stayed in view of the on-going efforts to resolve the employment litigation. Provost Anderson testified at trial that Alexander had asked her not to evict Dr. Vossoughi. Nonetheless, in November 1999, Provost Anderson wrote another letter demanding that Dr. Vossoughi vacate his laboratory.

In January 2000, unbeknownst to Dr. Vossoughi, a decision was made to clear out the contents of his laboratory to make room for a practical nursing program. Lucius Anderson, the acting director of UDC's Division of Continuing Education, supervised the eviction, which was completed in early February while Dr. Vossoughi was attending a conference out of town. Mr. Anderson hired a contractor and a helper to move the contents of the laboratory, which were supposed to be transferred to a secure storage space in the basement of the building. As Anderson testified at trial, he did not prepare a written inventory of the items in the laboratory before they were removed; he "visibly monitored" the eviction but was not present the entire time the contractor and helper were in the laboratory; and he had no "personal knowledge as to whether or not they may have thrown stuff out." He did not check whether all the contents of the laboratory were stored properly, because "the things we took out of the area ... were already in boxes by the time they arrived in the storage area."

On February 11, 2000, Dr. Vossoughi returned to his laboratory, found the door open, and discovered that "[m]ost of the lab was empty except some big pieces there." He testified at trial that he saw "a lot of [his] stuff in the trash dumpsters" around the building, but approximately "80, 90 percent of [his] things were gone." Dr. Vossoughi immediately telephoned his attorney, who instructed him to take photographs to document the condition of his laboratory. The photographs, which were in evidence at trial, show a laboratory stripped of virtually all its contents, surrounded by piles of trash and stacked boxes. Dr. Vossoughi testified that a trash

bin in one photograph contained "mostly [his] experiments, which were broken, dismantled." When asked at trial whether he did anything to try to retrieve property from the trash, Dr. Vossoughi responded that "if 80, 90 percent of your belongings are gone, you don't care at that time about 10 percent trash left over." Later, Dr. Vossoughi did seek to retrieve or inventory his stored belongings, but UDC initially did not permit him to do so. Eventually, Dr. Vossoughi was allowed to inventory the property and take what was his. He testified at trial that he did not include any recovered property in his claim for damages.

## II.

Dr. Vossoughi sought compensation from UDC for the destruction of four main types of personal property: (1) course materials; (2) unpublished research data; (3) scientific instruments that he had fabricated; and (4) equipment and other items that he had purchased from commercial vendors. The value of this property was a principal, though not the sole, component of Dr. Vossoughi's damages claim.[2] Because most of the lost property was unique or had no fair market value, Dr. Vossoughi asked the jury to award him its replacement value. In order to establish the value of his lost property, Dr. Vossoughi relied on his own testimony and, with respect

to all but the commercially available items, the testimony of two expert witnesses, Dr. Ted Conway and Dr. Subrata Saha. Dr. Conway, a biomedical engineering researcher at the University of Central Florida, was "on loan" at the time of trial to the National Science Foundation, where he was in charge of its funding program for research and disabilities education. In connection with that assignment, Dr. Conway had earned a "master's certificate" in project management at George Washington University. Dr. Saha was a professor at Alfred University, where he taught courses in bioengineering, biomechanics and related fields, as well as a course in engineering economic analysis. Both Dr. Conway and Dr. Saha had collaborated with Dr. Vossoughi on research projects, and they were generally familiar with his work, the courses he taught, and his publications and scientific reputation.[3]

*Dr. Vossoughi's Lost Course Materials*

Dr. Vossoughi testified that when UDC emptied his laboratory, it destroyed class notes and other materials he had developed to teach a total of twenty-one different courses. Most of the courses were in engineering subjects, though two were architecture courses. Dr. Vossoughi created all but one of these courses while he was at Catholic University; the exception was created at UDC. He testified that creating new course materials involves

---

**2.** Dr. Vossoughi also sought an unspecified amount of compensation for the injury to his professional career caused by the destruction of his laboratory. Dr. Vossoughi's expert witnesses testified without contradiction that his *future job prospects had been severely limited, if not devastated, by his inability to bring his laboratory with him to any prospective university position.* As part of his damages, Dr. Vossoughi also cited the unquantifiable loss of his 158–page curriculum vitae (which listed all his awards and publications, and which he was unable to recreate in full). The jury evidently gave weight to this testimony, because its award of $1.65 million materially

exceeded the total value that Dr. Vossoughi had placed on his lost equipment and intellectual property. On appeal, UDC does not challenge Dr. Vossoughi's recovery of such consequential damages.

**3.** Dr. Conway described Dr. Vossoughi as "renowned" for his influential discovery and investigation of residual stresses in soft tissues. According to Dr. Conway, "most textbooks on fundamental mechanics of the human body ... reference [Dr. Vossoughi's] pioneering work in the residual stresses in the cardiovascular system."

not just getting [a] few text book[s], reading, learning, and teaching. For specialized courses, you have to do a lot of research.... And then for each course you come up with solution[s] of the examples, exams. And then for laboratory courses, a lot more time, of course.

Dr. Vossoughi estimated that the typical course took one quarter of a year, or half of one semester, to create, and that it represented an investment of time worth $25,000—a figure he justified by explaining that the average tenured engineering professor is paid a salary of $100,000 for a full year, or two semesters. Thus, Dr. Vossoughi placed a total value of $525,000 on the twenty-one sets of course materials destroyed by UDC. On cross-examination, Dr. Vossoughi acknowledged that he had not based this valuation on his own compensation, which had been considerably less than $100,000; when he was an adjunct professor at UDC, his salary was about $62,000 per year. Dr. Vossoughi also stated that he had never tried to sell his course materials, because "[n]obody would buy somebody else's notes. It's useless [sic] only for that particular class."

Both Dr. Conway and Dr. Saha supported the reasonableness of Dr. Vossoughi's valuation. In the opinion of Dr. Conway, who was personally acquainted with many of Dr. Vossoughi's course materials,[4] $25,000 per course was a "good, ... conservative estimate" of their value. Dr. Conway explained that Dr. Vossoughi had created advanced courses based on his own expertise and experimental background, and his lecture notes for a given course could be up to 450 pages long. Dr. Conway and Dr. Saha agreed that it would

take half a semester to develop such materials for a new course. They also agreed that it was reasonable to assume an average salary of $100,000 a year for a professor of Dr. Vossoughi's standing in valuing such a time investment. Dr. Conway noted that a junior professor would earn that amount "at most universities across the country." He added that Dr. Vossoughi had been "considered for a position at my university but unfortunately he wasn't able to have any lab equipment to bring with him and he wasn't offered the position. It would have been $130,000 a year."

*Dr. Vossoughi's Unpublished Research*

Dr. Vossoughi also sought damages for the loss of his unfinished and unpublished research. Over his long career, he testified, he had worked intermittently on "hundreds" of discrete research projects. ("If I get bored or something doesn't work for few weeks, I quit that, go to something else, come back the next month.") Although he could not describe the research with specificity, Dr. Vossoughi claimed that "at least ten" such on-going projects were lost when UDC evicted him. He testified that he had performed most of his work on eight of these research projects when he was at Catholic University (though he continued to work on them, on and off, at UDC), and that he had started and worked on the other two projects after he came to UDC. Dr. Vossoughi did not have a "specific recollection" of how much time he had invested in these research activities "over the years." However, based on his "prior time commitment to this unpublished data," and his judgment (in light of his past experience applying for and receiving grants) that a typical scienti-

---

4. In his voir dire examination outside the jury's presence, Dr. Conway described Dr. Vossoughi's course materials as

> some of the best that I have ever seen, with respect to the details of what he would

teach in the classroom, as well as all the evaluation tools that he used. Having created many courses myself, I can attest to the fact that it's a tremendous amount of work.

fic project would be supported by a research grant of around $200,000, Dr. Vossoughi sought $50,000 in damages for each lost project, or $500,000 in total. Dr. Vossoughi insisted that $50,000 per project was a "very, very low estimate."

Dr. Conway testified that he had some familiarity with the unpublished research that had been in Dr. Vossoughi's laboratory, because

[h]e and I actually were getting ready to publish a couple of papers based on the research that he was doing. And unfortunately we lost that data, so we weren't able [to] publish that research. And in not doing so—it's irreplaceable data. It's just irreplaceable data. It's just—well, it's very difficult to deal with someone destroying irreplaceable data. And obviously we didn't publish because of that. But there was a lot of time and effort that went into it, up to that point.

On cross-examination, Dr. Conway elaborated that "a lot of the work that [Dr. Vossoughi] was doing wasn't being done by anybody else":

[A]t the level that we were doing research together, . . . it was research that no one else was doing. He was doing a lot of experimental work and I was doing the analytical—analytical or constituent modeling. The computer modeling or the mathematics to create the computer modeling. So we had a nice symbiotic relationship going. And so when he lost the data, . . . it was devastating because I was right in the middle of working on these models that seemed to be approaching something that was useful.

Dr. Conway believed that Dr. Vossoughi's figure of $50,000 constituted a "conservative" or "reasonable" estimate of the value of each lost project. "Working at the National Science Foundation," he explained,

a ball park figure that we look at when evaluating a budget for a project is

about $100,000 per project, plus or minus, . . . depending on the scope of the project. Out of that 100,000, the university will take 50,000 off the top. It's called overhead or indirect cost. . . . So for every tax dollar that you'd like to see going into research, only 50 cents goes to it, the rest goes to the administrators. . . . So $50,000 per self-contained research project is a good ball park figure that most funding agencies use as a guideline.

Dr. Saha, who knew Dr. Vossoughi's scientific work well, if not the specifics of the unpublished research that Dr. Vossoughi had lost, described how "it takes [a] fair amount of time to complete any research project." He also explained that the loss of unpublished research data injures a scientist's "future job prospect[s]," which depend on a "record of publications." Dr. Saha agreed that Dr. Vossoughi had put a reasonable value on his unpublished research data; in fact, he thought $50,000 per project was "on the low side," given that one would expect a scientist to publish "perhaps two research papers" based on the work that "nowadays" would be supported by a grant of $200,000 for a two-year period.

*Fabricated Scientific Instruments*

Dr. Vossoughi testified that UDC destroyed nineteen "unique" scientific instruments that he had designed and built in order to conduct his research at Catholic or UDC. Dr. Vossoughi claimed that these specialized instruments were not commercially available and had no market value. Although some of these devices were old, Dr. Vossoughi said he continued to use and improve them throughout his career. Dr. Vossoughi could not specify when he initially fabricated each instrument, except to state that only two of the items—a drop test system and a film puncture test appa-

ratus, which he valued at $5,000 apiece—were created at UDC.

Dr. Vossoughi sought damages totaling $287,000 for the nineteen lost instruments. He arrived at that figure by assigning a replacement value to each device based on the estimated cost of its materials and, mainly, the amount of time he believed he would have to spend to recreate it. Some of the lost instruments included: a "robot gripper" valued by Dr. Vossoughi at $15,000 that measured "how stresses are distributed on [a] robot finger," which he used to write a chapter in a book called "Robot Grippers"; a "mechanical torquing device" worth $2,500 that measured the mechanical properties of blood vessels; "soft tissue photographic items" worth $12,000, which were "designed for soft tissue testing and recording;" an "inflation extension apparatus" valued at $20,000 that enabled Dr. Vossoughi to study blood vessels under hypertension;[5] a residual stress testing mechanism worth $15,000, which Dr. Vossoughi had used to demonstrate that arteries are not "residual-stress-free;"[6] torsion, axial compression and other instruments worth a total of $22,500, which Dr. Vossoughi had developed to improve clamps utilized by trauma surgeons on broken limbs; a "self-design[ed] and constructed modified microscope" valued at $5,000; a device to measure the thickness of soft tissue and other very soft material without squeezing it, valued at $2,000; a "uniaxial test system" worth $15,000; a "very complicated" apparatus to measure the "shear properties of biological tissues," which took Dr. Vossoughi several years to perfect, and which he valued at around $100,000; and a "knee testing machine" worth $15,000, which Dr. Vossoughi had created to conduct tests with an orthopedic surgeon ("I came up with complete system.... [W]e quantified how ... dynamic forces when you run, for example, or jump up and down are transferred from the impact on foot ... to your upper extremity or through the knee.").

Dr. Conway testified that he was familiar with "probably 80 percent" of the fabricated instruments that Dr. Vossoughi had identified as lost. Because such equipment was so "research-specific," Dr. Conway testified, it was not available "on the open market" and could not be bought "secondhand at a devalued price or a depreciated price." Consequently, Dr. Conway opined, it was appropriate and "conservative" to value Dr. Vossoughi's fabricated instruments at their "present day replacement cost," measured by the cost in materials and machinist time (at the rate of $250 to $400 an hour charged by the average machine shop) to re-fabricate them. By that measure, in Dr. Conway's opinion, Dr. Vossoughi's estimated valuations were "low but reasonable."

Dr. Saha, who was generally familiar with the equipment in Dr. Vossoughi's laboratory, seconded Dr. Conway's opinions. Based on his own experience fabricating scientific equipment, Dr. Saha stated that the damages requested by Dr. Vossoughi for such equipment were "quite reasonable" and "rather on the lower side" because producing each instrument would "involve[ ] a large amount of a person's time, outside agency's time, like a machine shop and so on." Dr. Saha added that the instruments remained useful and did not

---

5. Dr. Vossoughi estimated that it would cost over $80,000 "just to do that study." "We study parametrically what happens to blood vessel[s] when we get ... high blood pressure. And that paper was published [and] extremely well referred. Everybody asked for reprints."

6. According to Dr. Vossoughi, he was "the first one in the world to create" such a device, and he considered it his "best work." He asserted that his discovery of residual stresses in arteries had sparked the publication of over 400 scientific papers on the subject.

become outdated, and that even taking wear and tear into account, their values exceeded what Dr. Vossoughi had estimated.

*Equipment and Other Materials Purchased from Commercial Sources*

Finally, Dr. Vossoughi testified that UDC had destroyed equipment and other items he had purchased from commercial vendors. These items included scientific and medical instruments, tools and other devices; cameras and other photographic equipment; computer parts; a refrigerator; laboratory and office supplies; and scientific publications. The commercially available items fell into two subcategories: a group of 86 items for which Dr. Vossoughi was able to produce receipts (or other documentation) showing the original purchase price; and a group of 38 items for which Dr. Vossoughi had no receipts. Dr. Vossoughi described these latter items individually and stated what he had paid for each of them. The original cost of the items in the first group amounted to $33,830; however, as the receipts showed, 18 of the items, costing a total of $7,435, were purchased with UDC funds and belonged to UDC. In the second group, Dr. Vossoughi acknowledged that eight items, costing a total of about $182,620, were bought with UDC funds and similarly belonged to UDC. Dr. Vossoughi testified that the original cost of the remaining 30 items in the second group added up to approximately $67,000.

Most of the commercially available items belonging to Dr. Vossoughi were at least eleven years old; Dr. Vossoughi brought them with him to UDC from Catholic University. Dr. Vossoughi testified that he used these items regularly in his work and that they were subject to wear and tear. He was not able, however, to estimate a current fair market value for the items. When he was asked on cross-examination whether the items had appreciated or depreciated in value, Dr. Vossoughi testified, "I can tell you this. All computer-related items are cheaper every day, as we experience. All laboratory instruments, medical devices, or medical experiment-related devices, every week the prices go up, just like that." Dr. Vossoughi sought to recover the cost of replacing most of this property without taking wear and tear and depreciation into account, on the ground that (except for a few items such as the cameras or the refrigerator) used equipment and supplies were not available for purchase on the open market.

*Jury Instructions Regarding Damages for Lost Property*

The trial court instructed the jury in standard fashion that it was Dr. Vossoughi's burden to prove his damages "with reasonable certainty." "[W]ith respect to valuation of property," the court elaborated, a plaintiff whose property has been destroyed or taken may recover its "fair market value," defined as "that price which a willing purchaser would be willing to pay to a willing seller for the property, without any compulsion on the part of either party to buy or sell the property just before it was lost." The jury could consider "any circumstances and conditions which may have altered the value of the subject property."[7]

---

**7.** Compare Instruction 15–6 of the Standardized Civil Jury Instructions for the District of Columbia (2007 Rev. ed.):

The "Fair Market Value" of [an item of] property is the price that would result from a fair negotiation between an owner desiring, but not obligated, to sell and a buyer desiring, but not obligated, to buy, and taking into consideration all the uses to which the property has been and might reasonably be applied.

To determine the fair market value of [an item of] property, you may consider its purchase price, its age, its condition, and any depreciation.

The court further instructed the jury how to value property for which a fair market value "cannot be determined or would be inadequate":

> If you find that the fair market value of the destroyed property cannot be determined or would be inadequate, such as when there is no demand for the property and no ability to sell it, or when the property was unique or possessed special qualities which could only be appreciated by its owner, you may consider the following factors in determining the actual value of the property. One, the age of the property; two, the degree to which the property was used by the owner; three, the condition of the property just before and after it was damaged; four, the uniqueness of the property; five, the reasonableness of re-creating or creating the property; six, the cost of recreating or replacing the property; seven, the degree to which the property wore out with age; and, eight, the opinion of the owner as to its value.

Counsel for Dr. Vossoughi and UDC expressed their satisfaction with these instructions.

### III. Admissibility of the Experts' Valuation Testimony

UDC contends that the trial court erred in permitting Dr. Conway and Dr. Saha to testify as to the value of Dr. Vossoughi's course materials, unpublished research, and fabricated devices. UDC asserts that the witnesses lacked the qualifications necessary to testify as experts on valuation and "merely rubber-stamped Vossoughi's speculative and erroneous valuations with-

out providing any reasonable basis for their opinions."[8] We disagree.

■■■ In this jurisdiction, the admissibility of expert testimony depends on three criteria:

> (1) the subject matter [must] be so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman; (2) the witness [must] have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth; and (3) the state of the pertinent art or scientific knowledge permits a reasonable opinion to be asserted by an expert.[9]

"The trial court has broad discretion in determining whether to admit expert testimony, and its ruling admitting or excluding such evidence will not be disturbed unless manifestly erroneous."[10] Similarly, "[w]hether a witness possesses the requisite qualifications to express an opinion on a particular subject is within the trial court's discretion, and its decision in that regard will only be reversed for an abuse."[11]

■■■ It is undisputed that the valuation of Dr. Vossoughi's specialized property was a proper subject for expert opinion testimony; it is certainly a subject "distinctly related" to Dr. Vossoughi's occupation and "beyond the ken" of the average lay juror. As to the experts' qualifications, the issue is not whether Dr. Conway and Dr. Saha had formal training in property appraisal, market valuations or financial analysis, nor whether they previously had been qualified as experts on the valuation of property. The witnesses had extensive

---

8. Brief for Appellants at 43.

9. *Jung v. George Washington Univ.*, 875 A.2d 95, 105 (D.C.2005) (internal quotation marks, emphases, and ellipses omitted), *amended on unrelated issue*, 883 A.2d 104 (D.C.2005).

10. *Id.* at 104 (internal quotation marks omitted).

11. *Id.* at 105 (internal quotation marks omitted) (quoting *Otis Elevator v. Tuerr*, 616 A.2d 1254, 1256 (D.C.1992)).

experience as experimenters, researchers and academics in Dr. Vossoughi's field, and they had considerable familiarity with Dr. Vossoughi's laboratory, research and achievements. Each witness had worked with Dr. Vossoughi, fabricated similar equipment, created and taught similar courses, performed similar research, and funded or budgeted similar projects. The trial court readily could find that the witnesses' knowledge and experience prepared them to offer informed opinions regarding the time and resources necessary to replicate Dr. Vossoughi's lost course materials, unpublished research, and specially fabricated devices.

Furthermore, the record does not support UDC's claim that Dr. Conway and Dr. Saha "rubber-stamped" Dr. Vossoughi's valuations and could not provide "any independent, reliable, or rational basis for their opinions." [12] Dr. Conway and Dr. Saha articulated methodologies for estimating the value of each type of property on the basis of objective data—e.g., fabrication costs, academic compensation rates, grant funding guidelines and practices. These methodologies were not precise, but (as we shall discuss below) this is an area in which precision is neither achievable nor required. It is enough that the methodologies constituted reasonable ways of approximating what it would cost to recreate the course materials, research data, and fabricated equipment that Dr. Vossoughi lost. While there were some gaps in the witnesses' knowledge, notably with respect to the exact nature of much of Dr. Vossoughi's unpublished research, these gaps were exposed at trial and did not vitiate the overall reliability of Dr. Conway's and Dr. Saha's testimony.

In short, the trial court had ample grounds to find that the valuation testimony involved subject matter beyond the ken of the average lay juror; that it was provided by qualified experts; and that it had a reasonable and reliable basis. We conclude that the court did not abuse its discretion by admitting the testimony.

## IV. Sufficiency of the Evidence of Value

UDC also challenges the sufficiency of the evidence to support an award of damages for the value of the lost property. It argues that Dr. Vossoughi failed to account for the depreciation of the items he purchased from commercial sources, and that his estimates of replacement cost for the other classes of property were speculative and unreliable.

 As part of his damages for the conversion and total destruction of his personal possessions, Dr. Vossoughi was entitled to recover the value of that property. Measuring that value was no easy undertaking, particularly because of the specialized and unique nature of Dr. Vossoughi's course materials, research and fabricated instruments (which the trial court aptly described as "rather esoteric"). Moreover, because the property was lost, it could not be examined. Nonetheless, "personal property is not valueless because its value may be difficult to establish or proof of the exact amount of loss is unavailable." [13] "An injured party will not be precluded from recovering damages because he cannot prove his exact damages so long as there is a reasonable basis for approximation." [14] Dr. Vossoughi was not required to prove the value of his lost property with "mathematical precision," [15] but only with

---

12. Brief for Appellants at 45.

13. *Hartford Accident & Indem. Co. v. Dikomey Mfg. Jewelers, Inc.*, 409 A.2d 1076, 1082 (D.C. 1979).

14. *Bowler v. Joyner*, 562 A.2d 1210, 1214 (D.C.1989) (internal quotation marks omitted).

15. *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 329 (D.C.2001).

"a fair degree of probability,"[16] or what we have termed "reasonable certainty."[17] Thus, while an award of damages "may not be based on speculation or guesswork, it may be a just and reasonable estimate based on relevant data. Probable and inferential considerations as well as direct and positive proof may provide the basis for an award."[18] And "the courts quite reasonably have been very liberal in permitting the jury to award damages where the uncertainty as to their extent arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible."[19]

The usual and "traditional" measure of damages for conversion of property is "the fair market value of the property at the time of the conversion."[20]

In determining the fair market value of a used item, neither its original cost nor its current price new is definitive, for its condition may have changed, and depreciation must be considered.[21] But fair market value is not always the test. "Sometimes fair market value cannot be determined, or would be inadequate, as when, for example, the article destroyed was unique or possessed qualities the special nature of which could only be appreciated by the owner."[22] Accordingly, for purposes of awarding adequate compensation for the destruction of property, "value means exchange value *or the value to the owner if this is greater than the exchange value.*"[23] In general, therefore, "[a] person tortiously deprived of property is entitled to damages based upon its special value to him if

---

**16.** *Hartford Accident & Indem. Co.*, 409 A.2d at 1082 (internal quotation marks omitted).

**17.** *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 549 (D.C.1981).

**18.** *Id.* at 550 (citations omitted).

**19.** *Hawthorne v. Canavan*, 756 A.2d 397, 401 (D.C.2000) (internal quotation marks and brackets omitted) (quoting W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 52, at 350 (5th ed.1984)).

**20.** *Maalouf v. Butt*, 817 A.2d 189, 190 (D.C. 2003) (quoting *Bowler v. Joyner*, 562 A.2d 1210, 1213 (D.C.1989)).

**21.** *See, e.g., Mahallati v. Williams*, 479 A.2d 300, 306–07 (D.C.1984) (holding an award of damages for loss of a ten-year-old fur coat to be "excessive and against the weight of the evidence," because the jury awarded the original cost of the coat "without regard to its age, use or depreciation").

**22.** *United States v. Maryland*, 116 U.S.App. D.C. 259, 266, 322 F.2d 1009, 1016 (1963), *rev'd on other grounds*, 382 U.S. 158, 86 S.Ct. 304, 15 L.Ed.2d 226 (1965). *See also Am. Serv. Ctr. Assocs. v. Helton*, 867 A.2d 235, 242 (D.C.2005) ("[N]o single fixed rule for recovery of damages for injury to personal property will invariably make an injured party whole;

rather, the measure of damages depends upon the facts of the particular case.").

**23.** Restatement (Second) Torts § 911(1) (emphasis added).

The phrase "value to the owner" denotes the existence of factors apart from those entering into exchange value that cause the article to be more desirable to the owner than to others.

Some things may have no exchange value but may be valuable to the owner; other things may have a comparatively small exchange value but have a special and greater value to the owner. The absence or inadequacy of the exchange value may result from the fact that others could not or would not use the thing for any purpose, or would employ it only in a less useful manner. Thus a personal record or manuscript, an artificial eye or a dog trained to obey only one master, will have substantially no value to others than the owner. The same is true of articles that give enjoyment to the user but have no substantial value to others, such as family portraits. Second-hand clothing and furniture have an exchange value, but frequently the value is far less than its use value to the owner. In these cases it would be unjust to limit the damages for destroying or harming the articles to the exchange value.

*Id.*, cmt. e.

that is greater than its market value."[24] Where the lost property in such cases is replaceable, it is appropriate to measure damages for its loss by the cost of replacement.[25]

■■■ UDC does not dispute that replacement cost was an appropriate measure of damages for the destruction of Dr. Vossoughi's course materials, unpublished research and fabricated instruments. As the evidence showed, this property had great use value to Dr. Vossoughi but no comparable (if any) market value. We think the jury could have reached the same conclusion with respect to some of the equipment and materials Dr. Vossoughi had purchased from commercial sources. The fair market value of those used items, like that of second-hand clothing or furniture, may have been so much less than their use value to Dr. Vossoughi that "it would be unjust to limit the damages for destroying ... the articles to the exchange value."[26] As to at least some of the purchased items, however, we agree with UDC that fair market value was the appropriate measure of damages.

The trial court correctly charged the jury in accordance with the foregoing principles, and we are satisfied there was sufficient competent evidence to permit the jury to apply them appropriately to each class of property in issue. As to the purchased articles, UDC argues that Dr. Vossoughi merely presented evidence of their original cost without factoring in depreciation. But Dr. Vossoughi testified (at considerable length) to the age, usage and condition of the property, and the court instructed the jury to take those factors into account in addition to the purchase price. We do not think Dr. Vossoughi was obliged to estimate the depreciated value of his purchased items, even if it would have been feasible to do so (which we doubt). The jury had enough information to apply a meaningful discount to the original purchase price, and (unlike in *Mahallati*[27]) we cannot find that it failed to do so.

■■■ As to Dr. Vossoughi's other property (which accounted for the bulk of his claimed damages), UDC does not persuade us that the evidence of its replacement cost was "so speculative, flawed, and unreliable that it should never have been submitted to the jury."[28] In essence, Dr. Vossoughi based his estimates of the value of the property on the time it would take him to replicate it. This was a conceptually reasonable approach, not—*pace* UDC—a "mysterious" one.[29] UDC complains of the vagueness of Dr. Vossoughi's testimony: for example, his estimates were rough approximations, and he did not specify exactly how he valued his or others' time (he was not asked to do so). But our cases have held that an owner is qualified to estimate the value of his property based on

**24.** Restatement (Second) Torts § 927 cmt. c. This principle is subject to some reasonable limitations; for example, most courts have held that damages cannot be based on sentimental value. The dividing line between recoverable "special" value to a plaintiff and unrecoverable "sentimental" value may be difficult to draw or to discern. *See Edmonds v. United States*, 563 F.Supp.2d 196, 203 (D.D.C.2008).

**25.** Restatement (Second) Torts § 911 cmt. e. An adjustment may be made where the replacement goods are worth more to the plaintiff than the originals. *See generally* DAN B. DOBBS, LAW OF REMEDIES §§ 5.13(1), 5.14(1) (2d ed.1993):

**26.** Restatement (Second) Torts § 911 cmt. e.

**27.** *Mahallati, supra* note 21,479 A.2d at 307.

**28.** Brief for Appellants at 40.

**29.** *Garcia v. Llerena*, 599 A.2d 1138, 1144 (D.C.1991) (holding that plaintiff failed to prove his lost business profits where his "only basis for measuring [them] was [a] mysterious 'one-third of gross' formula" unsupported by any evidence).

his familiarity with its quality and condition, even if he lacks valuation expertise or hard evidence to support his opinion.[30] In this case, Dr. Vossoughi certainly had the requisite familiarity, and given his experience as a fabricator of instruments, a teacher, a researcher, and a grant recipient, he also had considerable expertise to draw on. His opinions clearly were informed ones. There is nothing to show that his estimates were unrealistic; on the contrary, they were corroborated by Dr. Conway and Dr. Saha. It is true those experts testified without having seen all of the property in question (though they had seen some of it), but such familiarity is not required so long as they had other reasonable grounds for their evaluations.[31]

UDC further argues that Dr. Vossoughi's valuation of his course materials was flawed in three respects. First, Dr. Vossoughi admitted his course materials were not salable ("Nobody would buy somebody else's [teaching] notes. It's useless [sic] only for that particular class."). But as we have explained, the absence of an exchange value does not mean the course materials had no compensable use value to Dr. Vossoughi. Second, Dr. Vossoughi acknowledged having been compensated by Catholic University or UDC from his teaching salary to prepare the course materials and teach the courses. But this fact does not diminish the value of his course materials to Dr. Vossoughi; if anything, it confirms their value. Third, Dr. Vossoughi used the $100,000 salary of an average tenured professor to value the time he would have to spend to recreate the course materials even though he earned much less than $100,000 when he created the courses and, UDC argues, there was no evidence he could secure a

tenured position. But UDC's demonstration that Dr. Vossoughi had earned less than a tenured professor did not eliminate the evidentiary basis for an award of damages for the lost course materials; it merely allowed the jury to place a lower value on Dr. Vossoughi's time and award him less than he sought. (In any event, there was some evidentiary support for Dr. Vossoughi's claimed earning capacity: both Dr. Conway and Dr. Saha lauded his accomplishments as a teacher and researcher, and Dr. Conway testified that the University of Central Florida had considered hiring Dr. Vossoughi at a salary of $130,000.)

Finally, UDC argues that Dr. Vossoughi's evidence could not support an award of damages for the destruction of his unpublished research results because he could not describe the research or recall how much time he had devoted to each project over the years. There is force to this argument. Nevertheless, Dr. Vossoughi's testimony about the existence and scope of his lost research projects was corroborated by Dr. Saha and, particularly, Dr. Conway (who was personally involved in some of the lost research). Ultimately, it was for the jury to decide whether to credit Dr. Vossoughi's factual claims. The estimate of $50,000 per lost project was not without evidentiary support.

If plaintiffs were obliged to prove the amount of their damages with certainty and exactitude, Dr. Vossoughi's evidence would not pass muster. But definitive and precise proof of damages is rarely possible and not required. Rough justice in the ascertainment of damages is often the most that can be achieved, and it is better

---

30. *Maalouf,* 817 A.2d at 190–91.

31. *See, e.g., Hartford Accident & Indem. Co.,* 409 A.2d at 1082 ("[A]n expert may testify as

to value from a description of the lost item at trial, a view shared by a majority of courts.").

than nothing. The evidence need only furnish a reasonable basis for approximation. We conclude that Dr. Vossoughi's evidence met this relatively lenient test and allowed the jury to determine a fair amount of compensation for UDC's destruction of his property.

## V. Mitigation of Damages

 UDC contends that the trial court erred in denying its request for an instruction on Dr. Vossoughi's failure to mitigate his damages. During the trial, UDC asked for such an instruction because the evidence showed (1) that Dr. Vossoughi could have removed and protected his property long before UDC cleaned out his laboratory, and (2) that Dr. Vossoughi "was there during the move when it was in progress [and] could have requested that they stop [or] done something during that time to lessen what was happening." In its post-trial motion, UDC advanced a third basis for the mitigation instruction, that Dr. Vossoughi could have tried to safeguard or retrieve his property from the trash when he returned to his laboratory on February 11, 2000, shortly after it had been cleaned out. Even taking this latter rationale into account, we conclude

that the trial court properly denied UDC's request.

 "The doctrine of avoidable consequences, also known as the duty to mitigate damages, bars recovery for losses suffered by a non-breaching party [here, Dr. Vossoughi] that could have been avoided by reasonable effort and without risk of substantial loss or injury." [32] The burden of proving that losses reasonably could have been avoided "rests with the breaching party [here, UDC]." [33]

 UDC did not carry its burden: as the trial court recognized, there was insufficient evidence to support an instruction on mitigation.[34] To begin with, UDC's reliance on Dr. Vossoughi's failure to protect his property *before* UDC tortiously removed and destroyed it was misplaced. "The rule of avoidable consequences comes into play *after* a legal wrong has occurred, but while some damages may still be averted, and bars recovery only for such damages." [35] In other words, because a plaintiff's so-called duty to mitigate arises only in response to a breach of duty by the defendant, Dr. Vossoughi's actions prior to his eviction could not furnish the basis for a mitigation instruction.[36]

---

**32.** *Edward M. Crough, Inc. v. Dep't of Gen. Servs. of the District of Columbia*, 572 A.2d 457, 466 (D.C.1990). *See generally* DOBBS, *supra* note 25, § 3.9 at 380 ("The avoidable consequences rules, or rules for minimizing damages, are cardinal instruments of damages measurement.... Minimizing damages rules apply in all kinds of cases, including contract, tort, and statutory claims.") (footnotes omitted).

**33.** *Crough*, 572 A.2d at 467.

**34.** A party is entitled to an instruction on its theory of the case so long as there is "some evidence" to support it. *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C.1997) (quoting *Hilord Chem. Corp. v. Ricoh Elec., Inc.*, 875 F.2d 32, 38 (2d Cir.1989)).

**35.** *Robinson v. Carney*, 632 A.2d 106, 108 n. 4 (D.C.1993) (quoting W. PAGE KEETON ET AL.,

PROSSER AND KEETON ON THE LAW OF TORTS § 65, at 458 (5th ed.1984)) (emphasis added). *See also Foster v. George Washington Univ. Med. Ctr.*, 738 A.2d 791, 795, 795 n. 6 (D.C.1999) (explaining that "contributory negligence and mitigation are conceptually horses of a different color," because "they occur—if at all—at different times") (citations omitted).

**36.** At oral argument, UDC's counsel suggested that Dr. Vossoughi might be deemed to have abandoned the property he left in his laboratory. *But see Kearns v. McNeill Bros. Moving & Storage Co.*, 509 A.2d 1132, 1136 (D.C.1986) ("Abandoned property is that to which the owner has voluntarily relinquished all right, title, claim, and possession, with the intention of terminating his ownership, but without vesting it in any other person and with the intention of not reclaiming future possession or resuming its ownership, posses-

The trial court also correctly rejected UDC's other rationales for the instruction. No evidence suggested that Dr. Vossoughi was present when UDC's agents cleaned out his laboratory. On appeal, UDC argues only that Dr. Vossoughi might have salvaged some of his property from the trash when he returned to his laboratory after the event. But on the present record, that is speculation. As previously mentioned, Dr. Vossoughi testified that "80, 90 percent" of his property was gone, and the rest was "trash left over." UDC did not meet its burden of establishing what, if any, property Dr. Vossoughi could have recovered from the dumpsters, piles of trash, and boxes he observed, let alone the value of that property.[37]

## VI. Exclusion of Damages for UDC Property

Lastly, UDC contends that the trial court erroneously allowed the jury to award damages for the loss of property that Dr. Vossoughi did not own—namely, property Dr. Vossoughi acquired or developed with grant funds during his tenure at UDC, which belonged to UDC. Specifically, UDC argues that the court should have (1) granted its Civil Rule 50[38] motions for partial judgment as a matter of law, and (2) given its proposed jury instruction stating that Dr. Vossoughi had no ownership rights to property derived from grant funds awarded to UDC. We think neither argument is well taken.

*The Rule 50 Motion*

 In moving for judgment as a matter of law at the close of trial, UDC sweepingly argued that because items purchased or created with grant funds belonged to the institutional grantee rather than to the researcher, Dr. Vossoughi owned *none* of the property UDC had removed from his laboratory and destroyed. According to UDC, that property belonged either to Catholic University or to UDC itself, and Dr. Vossoughi therefore could recover nothing for its loss. With respect to the many items Dr. Vossoughi had brought with him from Catholic University, the trial court disagreed, and it denied UDC's motion outright—a ruling UDC does not challenge on appeal. While the court expressed doubt that UDC was entitled to judgment as a matter of law even with respect to articles purchased or created by Dr. Vossoughi at UDC, it deferred ruling on the balance of UDC's motion until after the jury returned its verdict.[39] Ultimately, following that verdict, UDC renewed its request for partial judgment as a matter of law, and the court denied it. The court agreed that property derived from grant funds received by UDC belonged to UDC and not Dr. Vossoughi. However, the court explained, the application of that principle to the items removed from Dr. Vossoughi's laboratory and destroyed by UDC had been a "hotly contested" issue at trial; that ownership issue had been "crystallized by counsel for the jury in their

---

sion, or enjoyment. The owner must have utterly and entirely relinquished all hope and intent of recovering the property. Moreover, there must be a clear and unequivocal intent to abandon on the part of the owner, and the burden is on him who alleges abandonment to establish that intent.") (citations and quotation marks omitted). UDC did not argue abandonment at trial or seek a jury instruction on that theory. (Nor did UDC request an instruction on contributory negligence.)

**37.** *See Mark Keshishian & Sons, Inc. v. Washington Square, Inc.*, 414 A.2d 834, 842 n. 19 (D.C.1980) ("The burden of showing mitigation of damages is on the party raising the issue. Thus, it was up to appellants to establish the salvage value of the property appellee removed from the restaurant.") (citation omitted).

**38.** Super. Ct. Civ. R. 50.

**39.** *See* Super. Ct. Civ. R. 50(b).

presentation of evidence and in final arguments;" the regulations governing institutional ownership of grant-derived property had been admitted in evidence for the jury to consider; and Dr. Vossoughi had excluded articles made or purchased with UDC grant funds from his claim for damages.[40] The court stated it had "no doubt" the jury understood that Dr. Vossoughi was not entitled to compensation for such articles.

■■■ The trial court did not err in denying UDC's motion for judgment as a matter of law. "A trial court may grant a motion for judgment as a matter of law only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor."[41] Contrary to the premise of UDC's motion, the evidence at trial did not establish that all the property acquired by Dr. Vossoughi at UDC for which he sought compensation was derived from grant funds. No such showing was made with respect to the materials for the single course Dr. Vossoughi created at UDC; nor for the two scientific instruments he fabricated at UDC; nor for any of the lost research data he collected or generated at UDC. Indeed, in her summation to the jury, UDC's counsel did not argue that any of the foregoing property had been created with grant funds and belonged to UDC. The jury reasonably could have found that all of it

belonged to Dr. Vossoughi. It is true that Dr. Vossoughi admittedly utilized grant funds (or, conceivably, other university funds) to acquire the articles he purchased from commercial sources while he was at UDC. UDC would have been entitled to partial judgment as a matter of law with respect to those (comparatively few) purchased articles—but only those articles— had it specified them in its Rule 50 motion. But UDC did not assert its claims of evidentiary insufficiency with the particularity necessary for it to prevail.[42] UDC made no attempt to identify specific grant-derived property for the court, and the court was under no obligation to sort through the evidence on its own and limit UDC's motion to its proper scope.

Moreover, as the trial court stated, Dr. Vossoughi sought no compensation for items he purchased during his tenure at UDC. In his closing argument, Dr. Vossoughi's counsel emphasized that he had "taken out" and "excluded" from his list "any item that [Dr. Vossoughi] purchased while at UDC, with the exception of what's in these receipts." While UDC concedes that Dr. Vossoughi deleted the eight items (allegedly costing $182,620) he had purchased with UDC funds for which he had no receipts, it argues that counsel's "exception" shows he improperly requested damages for those UDC-purchased items (costing a total of $7,435) for which there were receipts. We think UDC misconstrues coun-

---

**40.** The trial court found that Dr. Vossoughi had "significantly pared down" his listing of destroyed property to exclude items fabricated or acquired with UDC grant funds, "specifically in response to the court's expressions of concern on this point." As a result, the court noted, the jury's verdict "reflected the reduced list, not the original compendium of lost and damaged items which exceeded $2 million."

**41.** *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.,* 957 A.2d 890, 902 (D.C.2008) (internal quotation marks omitted).

**42.** *See NCRIC,* 957 A.2d at 904 ("In a civil jury trial, Civil Rule 50(a) requires a party to assert its specific claims of evidentiary insufficiency in a motion for judgment as a matter of law before the case is submitted to the jury.... The failure to assert a particular sufficiency challenge in a Rule 50(a) motion precludes consideration of that challenge on appeal.") (footnotes omitted).

sel's remark; we suspect he meant that it was simply too much trouble to redact the exhibit containing the receipts. In any event, the jury easily could determine from the receipts which items had been purchased with UDC money and eliminate them, as UDC's counsel specifically urged the jury to do in her summation ("all you have to do is look through the receipts and you'll see District of Columbia at the top of the receipt"). Dr. Vossoughi's counsel did not dispute the point in his rebuttal.

*The Requested Jury Instruction*

On the next-to-last day of trial, the court asked the parties to submit their proposed jury instructions. That night, UDC faxed to the court a number of special instructions. UDC's proposed Special Jury Instruction Number 10 read as follows:

> In determining whether the plaintiff had an ownership right to the property in question, you cannot find that the plaintiff had any ownership rights over property purchased with or derived from grant money awarded to the University of District of Columbia. 31 U.S.C. § 6301, *et seq.;* 45 CFR Part 74; NSF Grants Policy Manual.

The next morning, the court informed the parties of the instructions it had prepared in consideration of the parties' requests. Although the court's instructions included nothing along the lines of UDC's proposed Number 10, UDC never objected to the omission (though its counsel did object to the omission of other instructions).

■ UDC claims that the court committed reversible error in failing to give its requested instruction. At the time of trial, however, Civil Rule 51 provided that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." [43] A party's failure to register a proper and timely objection "limits the scope of our review to plain error." [44]

■ UDC asks us to disregard its failure to object because the trial court had rejected the theory of Special Jury Instruction Number 10 when it declined to grant UDC judgment as a matter of law, and further objection would have been futile.[45] That is incorrect. The court had not yet rejected the possibility of partial judgment for UDC on its ownership claim—it deferred its final ruling on UDC's Rule 50 motion until after the jury returned its verdict—and it never disagreed with the proposition embodied in the proposed instruction, that property purchased or derived from UDC grant funds belonged to UDC. We have no reason to believe an objection to the omission of Special Jury Instruction Number 10 would have been unavailing.

■ Review for plain error is rigorous; we have said that we may grant relief for an unpreserved claim of instructional deficiency "only where it is apparent from the face of the record that a miscarriage of justice has occurred." [46] As is evident from our discussion of UDC's Rule 50 motion, there was no plain error here.

---

**43.** (Former) Super. Ct. Civ. R. 51. In its current form, the extensively revised Rule continues to require parties to make timely and specific objections in order to preserve claims of instructional error. *See* Super. Ct. Civ. R. 51(c), (d).

**44.** *Knight v. Georgetown Univ.,* 725 A.2d 472, 482 (D.C.1999).

**45.** *See Ball v. Arthur Winn Gen. P'ship/So. Hills Apts.,* 905 A.2d 147, 154 (D.C.2006).

**46.** *District of Columbia v. Banks,* 646 A.2d 972, 978 (D.C.1994) (internal quotation marks omitted).

The jury needed no instruction to understand that UDC, not Dr. Vossoughi, owned any property acquired with or derived from UDC grant funds. As presented at trial, this was not a subtle or difficult point. It was a central theme of UDC's defense, which UDC's counsel forcefully reiterated in her closing argument: she reminded the jury of the governing regulations (which were admitted in evidence) and of grant administrator Levermore's explanatory testimony, and she exhorted the jurors to examine each receipt before it to identify and exclude the items Dr. Vossoughi had purchased with UDC money. Moreover, there was no genuine dispute about UDC's ownership of grant-derived property, and Dr. Vossoughi's counsel essentially conceded the point. On the record before us, therefore, we have no reason to suppose the jury was either unable or unwilling to apply the correct rule of ownership in its deliberations.

## VII. Conclusion

This was an unusual case. The jury reasonably could find that UDC tortiously destroyed much of Dr. Vossoughi's life's work—intellectual property created and accumulated over decades—and ruined his professional career. While Dr. Vossoughi's lost course materials, unpublished research, and fabricated devices were difficult to value, the evidence allowed the jury to make a fair estimate of their worth. The jury's award may seem high to some (and clearly it does to UDC), but it is supported by admissible evidence and untainted by legal error. We have no grounds to overturn the verdict. The judgment of the trial court is hereby affirmed.