# District of Columbia Court of Appeals

**No. 14-CV-1275**

INDIRA POOLA,

Appellant,



FILED

SEP 29 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CAB-3-12**

HOWARD UNIVERSITY, *et al.*,

Appellees.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE:  THOMPSON and MCLEESE, *Associate Judges*; and KING, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgments on appeal are affirmed in part, and reversed and remanded in part.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:  September 29, 2016.

Opinion by Associate Judge Phyllis D. Thompson

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-1275

INDIRA POOLA, APPELLANT,

v.

HOWARD UNIVERSITY, *et al.*, APPELLEES.

FILED 9/29/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-3-12)

(Hon. Gregory E. Jackson, Motions Judge)
(Hon. Maurice A. Ross, Motions Judge)

(Argued February 9, 2016                    Decided September 29, 2016)

*David A. Branch* for appellant.

*Alan S. Block*, with whom *Elizabeth E. Pavlick*, was on the brief, for appellees.

Before THOMPSON and MCLEESE, *Associate Judges*, and KING, *Senior Judge*.

THOMPSON, *Associate Judge*:    Appellant Indira Poola, who for seventeen years had been a Research Professor at the Howard University ("University") College of Medicine, brought a multi-count complaint (originally filed on January 3, 2012, and amended on August 13, 2012) against the University and three

members of the College of Medicine faculty (the "individual appellees"), after she was denied re-appointment and prevented from entering her former laboratory (and other University offices where she had worked) to retrieve research data, laboratory samples, and other items of physical property. Judge Gregory Jackson granted appellees' motion to dismiss the first count of the amended complaint, which alleged that appellees blocked Dr. Poola's re-appointment on the basis of her race, gender, and national origin, in violation of the District of Columbia Human Rights Act ("DCHRA").[1] Judge Jackson also dismissed Dr. Poola's tortious interference claim against the three individual appellees (the only remaining claim against them), but allowed the tortious interference claim against the University (as well as claims for breach of implied contract, conversion, and negligence that were not the subject of the motion to dismiss) to proceed.

Thereafter, Judge Maurice Ross, to whom the case had been transferred, granted the University's motion for a protective order, prohibiting Dr. Poola from

---

[1] *See* D.C. Code § 2-1402.11 (a) (2001) ("It shall be an unlawful discriminatory practice" for an employer "[t]o fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion" . . . "wholly or partially for a discriminatory reason based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation of any individual[.]").

re-entering her former workspaces to identify and inspect the items of property she claimed she was forced to leave behind. Judge Ross also granted the University's motion for partial summary judgment, ruling that "all that [wa]s left of the case" were Dr. Poola's claims that the University was liable for negligence and conversion of items of her personal property. Restricted by Judge Ross's ruling to going to trial only on her (narrowed) conversion and negligence counts, Dr. Poola stipulated to dismissal of her personal-property-related claims in order to clear the way for this appeal.

For the reasons that follow, we conclude that the court did not err in dismissing Dr. Poola's DCHRA claims against individual appellees Dr. Edward Cornwell and Dr. Wayne A. I. Frederick, but did err in dismissing her DCHRA claims against the University and appellee Dr. Robert Taylor.[2] We find no error in

---

[2] Count II of Dr. Poola's Amended Complaint asserted, *inter alia*, that appellees' actions that caused Dr. Poola to be unable to complete her grant-funded research rendered her ineligible for future grants, thereby tortiously interfering with her prospective economic advantage. We discern from the record no reason why Dr. Poola's tortious interference claims should have been dismissed at either the motion to dismiss or summary judgment stage. *Cf. Emamian v. Rockefeller Univ.*, No. 07 Civ. 3919 (DAB), 2008 WL 4443824, *2, 8 (S.D.N.Y. Sept. 25, 2008) (dismissing tortious interference claim that was based on allegations that defendant university would not allow the plaintiff research professor to re-start her research, but stating that "were [p]laintiff to allege and identify a specific, existing business relationship that [d]efendant interfered with, as well as allege particular acts of [d]efendants, she may be able to state a claim for tortious interference with

(continued…)

the court's grant of partial summary judgment to the University with respect to Dr. Poola's claim for conversion insofar as it relates to "equipment" and "supplies" purchased with Department of Defense ("DoD") grant funds and with respect to "equipment" purchased with Susan G. Komen Breast Cancer Foundation ("Komen") grant funds. We conclude, however, that the court erred in granting summary judgment to the University on Dr. Poola's conversion claim insofar as it relates to "supplies" purchased with Komen grant funds and with respect to other property that Dr. Poola describes as her "work product," because the University did not establish as a matter of law that Dr. Poola has no ownership interest or superior possessory interest in that property. We also conclude that summary judgment was improperly entered in favor of the University on Dr. Poola's

---

(…continued)
prospective economic advantage"). However, given that Dr. Poola has not assigned as error the dismissal of her tortious interference claims, we leave those dismissals undisturbed as well.

Dr. Poola has not challenged the dismissal of her (Count III) claim for breach of implied contract, so we also do not disturb that result. We acknowledge Dr. Poola's assertion that she should be permitted to enter University facilities to inspect property she left behind because the property is "relevant to her damages related to her claims of tortious interference and breach of implied contract," but that bare assertion is not enough to preserve a challenge to the dismissal of her tortious interference and breach of implied contract claims. "We have held repeatedly that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Hensley v. District of Columbia Dep't of Emp't Servs.*, 49 A.3d 1195, 1206 (D.C. 2012) (internal quotation marks omitted).

negligence claim because the University did not establish as a matter of law that it owed no duty to Dr. Poola to safeguard the items in dispute. We remand for further proceedings consistent with this opinion.

**I.**

Dr. Poola, who identifies herself as a "South Asian female from India," asserted in her Amended Complaint that she is a "world-renowned cancer research scientist" who has held faculty positions at a number of universities, including the Johns Hopkins University Medical School and the George Washington University Medical School. According to the Amended Complaint, she has published over twenty scholarly articles, including in a medical journal that she asserts is "the world's most prestigious journal for medicine," has been a reviewer for "the nation's leading cancer research journals," and has been a frequent speaker at cancer research symposia. She began working as a Research Assistant Professor at the University in 1994, and during her tenure there, performed work under twenty externally funded grants. She was a "without compensation" professor, meaning that the University paid her salary out of funds from external research grant funds.

The Amended Complaint notes that the University is a "historically black college and university," the majority of whose faculty members, including at the College of Medicine, are African American. The Amended Complaint alleges that the University and its agents, including the individual appellees, who are African-American males, "willfully cultivated a pattern and practice of discrimination against non-African-Americans and females, by reason of race, national origin, and gender." According to the Amended Complaint, this discrimination "manifested" itself in the form of non-African-Americans and female staff being subjected to "discriminatory work assignments," "subjective performance appraisals which resulted in lower evaluations," a "disproportionate number of lower performance evaluations than African Americans and males," "discriminatory discipline and terminations," "terminations at a higher rate than African Americans and males," harassment, "discriminatory compensation and research funding policies," and belittlement of professional accomplishments.

The Amended Complaint further alleges that in 2010, Dr. Poola "was awarded prestigious grants" from Komen and from DoD. In August 2010, Dr. Poola requested re-appointment to the faculty of the University's College of Medicine Surgery Department to enable her to conduct research under the grants.

Shortly thereafter, Dr. Taylor[3] and Dr. Cornwell "met and decided to deny Dr. Poola's appointment."  In October 2010, Dr. Poola sought appointment to the Biochemistry Department, whose Chair "initially agreed to support her request," but later withdrew his support after he met with Dr. Taylor, who "demanded that Dr. Poola's appointment be denied."  The Amended Complaint further alleges that in January 2011, Dr. Poola met with the Chair of the Physiology Division, a white male, who thereafter requested that Dr. Taylor approve a partial salary for Dr. Poola in that Division.  In March 2011, Dr. Taylor denied the request.

The Amended Complaint alleges that Drs. Taylor and Cornwell took the foregoing actions to block Dr. Poola's appointment with the intent of "derailing the career of a non-African-American female and to prevent her professional accomplishments from eclipsing their own and those of African American and male faculty."  The Amended Complaint further alleges that Drs. Taylor and Cornwell "exhibited discriminatory animus against Dr. Poola in the form of disrespectful comments, belittling her accomplishments, attempting to steal her intellectual property, interference with her research, and unwarranted critique of her performance."

---

[3]  The Amended Complaint does not allege, but the summary judgment record indicates, that Dr. Taylor was Dean of the University's College of Medicine from 2005 to 2011.

According to the Amended Complaint, in May 2011, after the Physiology Division Chair requested that Dr. Poola be appointed to his Division without compensation from the University, Dr. Poola was notified by the Surgery Department Administrator that she should surrender "all equipment and intellectual property" and be prepared to leave the University by the end of June 2011. On June 30, 2011, the Surgery Department Administrator and a representative from the Dean's office came to Dr. Poola's office while she was in the middle of an experiment and demanded that she surrender her keys, identification badge, and parking sticker, and that she leave the premises. Dr. Poola was thus required to abandon her research and grants, "seventeen years of research and equipment and other property purchased with personal and grant funding" with an "aggregate value . . . exceed[ing] several million dollars." The Amended Complaint also alleges that Dr. Poola has "lost millions of dollars in future grants."

The Amended Complaint further alleges that in July 2011, after Dr. Poola sent letters to the Dean of the College of Medicine and other University officials stating her desire to continue working on her grant projects and her concerns about abandoning her research and losing future grants, Health Sciences Vice President Dr. Eve Higginbotham approved a 90-day reappointment for Dr. Poola. However,

although Dr. Taylor signed the approval letter, he allegedly "refused to acknowledge Dr. Higginbotham's authority and denied Dr. Poola access to the facility," doing so because he "resented the accomplishments of Dr. Poola as a non-African-American female" and with the intent to derail her career.

Finally, the Amended Complaint alleges that the defendants' treatment of Dr. Poola "mirrors the treatment to which [d]efendants have subjected other [M.D. or doctorate-level] non-African-Americans and/or females" in order to derail their careers. More specifically, it asserts that Dr. Higginbotham was removed from her position with only two days' notice, "after the African American males in the College of Medicine campaigned for her removal," in part because of her support of Dr. Poola; that a woman hired as an Assistant Vice President for Faculty Development resigned after she was "subjected to pervasive harassment by African American male faculty" including Dr. Taylor, who "belittled [her] accomplishments and refused to recognize her authority"; that a woman hired as Provost was "removed in under one year after African American male faculty campaigned to have her removed"; that promptly upon his own hiring, Dr. Taylor forced a woman who had been Director of the Cancer Center for over ten years to accept a demotion; and that an "Asian Indian female" who was Chief of Oncology was belittled and harassed by Dr. Frederick and was forced to resign because of the

"lack of promotional opportunities available to non-African Americans and females." According to the Amended Complaint, during Dr. Poola's tenure at the University, appellees "never took the same or similar action against African Americans or males."

## II. The DCHRA Claims

### A. The Court's Rulings on the Defendants' Motions to Dismiss

In Count I of the Amended Complaint, Dr. Poola claims that appellees' conduct toward her violated the DCHRA. Ruling on appellees' motion to dismiss Count I, the court recognized that Dr. Poola's DCHRA claims were subject to a one-year statute of limitations.[4] The court then determined that the only actionable conduct by defendants/appellees was "discrete acts of discrimination" that occurred after January 3, 2011, i.e., within a year before Dr. Poola filed her original complaint. The court found that, regarding Dr. Frederick, Dr. Poola alleged only that he participated in "willfully cultivat[ing] a pattern and practice of discrimination against non-African-Americans and females, by reason of race, national origin, and gender[,]"and thus "failed to plead any specific allegations[.]"

---

[4] *See* D.C. Code § 2-1403.16 (a) (2001).

Our review of the Amended Complaint reveals that Dr. Poola also alleged that Dr. Frederick "belittled and harassed" the female Chief of Oncology. Whether or not that allegation or the allegation that Dr. Frederick "cultivated a pattern and practice of discrimination" was, in the court's words, "far too general to raise the right to relief above the level of speculation," what is clear is that the Amended Complaint does not identify the date(s) when Dr. Frederick allegedly so acted. Thus, Dr. Poola "failed to plead any specific factual allegations against Dr. Frederick" that occurred during the limitations period. Dr. Poola offers no specific rebuttal to, and we see nothing in the Amended Complaint that provides a basis for rejecting, appellees' argument that Dr. Poola's DCHRA claim against Dr. Frederick was untimely, and we therefore do not disturb the dismissal of the claim.

With respect to Dr. Cornwell as well, the court found that Dr. Poola's allegations either confirm that Dr. Cornwell's conduct occurred outside of the limitations period (e.g., Dr. Cornwell's decision, sometime before October 2010, to veto Dr. Poola's re-appointment to the Surgery Department) or fail to include the dates when he allegedly committed the described actions. As to Dr. Cornwell, too, we discern no basis for disturbing the court's dismissal of the DCHRA claim.

The court recognized that some of Dr. Poola's allegations about Dr. Taylor relate to conduct that occurred within the DCHRA limitations period. These include the allegation that in March 2011, Dr. Taylor denied the Physiology Division Chief's request that Dr. Poola be appointed to that Division and the allegation that in July 2011, Dr. Taylor denied Dr. Poola access to University facilities, in both instances because of Dr. Taylor's "resent[ment of] the accomplishments of Dr. Poola as a non-African-American female" and his discriminatory intent to derail her career. The court also recognized that Dr. Poola included in her Amended Complaint allegations about other (named) non-African Americans and women who were subjected to similar discrimination. The court ruled, however, that Dr. Poola's allegations were only "conclusory statements" that failed "[t]o establish the required nexus between the adverse employment actions and the alleged discriminatory motive." The court reasoned that Dr. Poola was required to "*show*, rather than merely *state* that the [d]efendant harbored discriminatory intent in carrying out the adverse employment actions against the [p]laintiff." The court therefore dismissed the DCHRA claim against Dr. Taylor for failing "to state a claim that raises the right to relief above the level of speculation." Finally, having dismissed the DCHRA claims against each of the individual defendants (the "agents" of the University), the court also dismissed the

DCHRA claim against the University.  Subsequently, on July 9, 2014, he denied Dr. Poola's motion to reconsider the dismissals.

## B.  Applicable Law

This court reviews *de novo* a dismissal under Super. Ct. Civ. R. 12 (b)(6) for failure to state a claim on which relief can be granted.  *See Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 371 (D.C. 2015).  In doing so, we construe the complaint in the light most favorable to the plaintiff and take her factual allegations as true.  *See Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015).  We have adopted the pleading standard articulated by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *See Equal Rights Ctr. v. Props. Int'l*, 110 A.3d 599, 602-03 (D.C. 2015).  Under that standard, to survive a Super. Ct. Civ. R. 12 (b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, i.e., "factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Comer*, 108 A.3d at 371 (internal quotation marks omitted); *see also Twombly*, 550 U.S. at 556 (explaining that the plausibility pleading standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence

of" the defendants' misconduct). A complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although this standard "does not require detailed factual allegations," it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; factual allegations must be enough to raise a right to relief above the speculative level. *Id.* at 678 (internal quotation marks omitted). But at the pleading stage, the plaintiff's burden "is not onerous." *Equal Rights Ctr.*, 110 A.3d at 603. If a complaint's factual allegations are sufficient, "the case must not be dismissed even if the court doubts that the plaintiff will ultimately prevail." *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1266 (D.C. 2015) (internal quotation marks omitted).

## C. Analysis

Dr. Poola argues that the court erred in ruling that her Amended Complaint was insufficient to state a claim. In particular, she argues that the court erred in ruling that she was required to allege more to establish the required "nexus" between the defendants' allegedly discriminatory motives and the denial of her reappointment and her exclusion from her laboratory and offices. She argues that the court's reasoning, i.e., that she must "*show*, rather than merely *state*, that the

[d]efendant[s] harbored discriminatory intent in carrying out the adverse employment actions[,]" effectively and improperly required her to establish a *prima facie* case when she had not yet had the benefit of discovery. On the basis of the analysis set out below, we agree, and therefore conclude that court erred in dismissing the DCHRA claims against Dr. Taylor and the University.[5]

Our analysis requires us to decide how the *Twombly*/*Iqbal* pleading standard is applied to a complaint alleging employment discrimination in violation of the DCHRA. We begin by giving careful attention to the Supreme Court's rationale in *Twombly*, a case in which the plaintiff alleged a conspiracy to restrain trade in violation of the Sherman Act, *see* 550 U.S. at 548-49, and in *Iqbal*, a case presenting Fifth Amendment equal protection and First Amendment claims, *see* 556 U.S. at 669.

The Supreme Court explained in *Twombly* that "when allegations of parallel conduct are set out in order to make a [claim under § 1 of the Sherman Act], they must be placed in a context that raises a suggestion of a preceding agreement, not

---

[5] The case on which the court relied, *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949 (D.C. 2000), discussed the showing of a "nexus" that was required for the plaintiff alleging employment discrimination to avoid summary judgment, not the allegations that are necessary to withstand a motion to dismiss. *See id*. at 954.

merely parallel conduct that could just as well be independent action." 550 U.S. at 557. Thus, the Court said, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made[,]" i.e., "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. At the same time, the Court explained, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage[.]" *Id.*

Turning specifically to the commercial context of the dispute before it, the *Twombly* Court agreed with the parties that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason, would support a plausible inference of conspiracy." *Id.* at 556 n.4 (internal quotation marks omitted). By contrast, the Court explained, even if a complaint alleges parallel conduct, "without [some] further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* at 557. Stated differently, "[a]n allegation of parallel conduct . . . gets the complaint close to stating a claim, but without some further factual enhancement[,] it stops short of the line between possibility and plausibility of "entitle[ment] to relief." *Id.* (internal quotation marks omitted). The Court acknowledged that "[i]n a

traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement," but observed as to the case before it — one in which "a natural explanation for the noncompetition alleged is that the former Government-sanctioned [telephone carrier] monopolists were sitting tight, expecting their neighbors to do the same thing" — "here we have an obvious alternative explanation." *Id.* at 556-57; *see also Iqbal*, 556 U.S. at 680 (observing that while "[a]cknowledging that parallel conduct was consistent with an unlawful agreement, the [*Twombly*] Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

The respondent in *Iqbal*, a citizen of Pakistan and a Muslim, alleged that in the wake of the events of September 11, 2001, the defendants, having arrested and detained respondent and many other Arab Muslim men, subjected them to harsh conditions of confinement "as a matter of policy, solely on account of [their] religion, race, and/or national origin and for no legitimate penological interest." *Id.* at 669 (internal quotation marks omitted). The *Iqbal* Court concluded that "[t]hese bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a formulaic recitation of the elements of a constitutional

discrimination claim, namely, that petitioners adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group, [and as] such, the allegations are conclusory and not entitled to be assumed true." *Id.* at 681 (citations and internal quotation marks omitted).

Although the *Iqbal* Court recognized that the respondent's allegations were "consistent with petitioners' purposefully designating detainees [as] 'of high interest' because of their race, religion, or national origin[,]" and acknowledged that the allegations were not necessarily "unrealistic or nonsensical," it concluded that "given more likely explanations, [the allegations] do not plausibly establish this purpose." *Id.* In describing the "more likely explanations," the Court recounted that the September 11 attacks were perpetrated by Arab Muslim hijackers who were members of al Qaeda, which was composed in large part of Arab Muslim disciples of Osama bin Laden. *Id.* at 682. The Court reasoned that "[i]t should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.* The Court reasoned that "[a]s between th[e] obvious alternative explanation" for the respondent's detention, "the purposeful, invidious discrimination respondent asks us to infer,

discrimination is not a plausible conclusion." *Id.* at 682 (internal quotation marks omitted). The Court concluded that the respondent's complaint did not "contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September-11 detainees as 'of high interest' because of their race, religion, or national origin." *Id.* at 682. Instead, "[a]ll [the complaint] plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity." *Id.* at 683; *see also id.* at 686 ("[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.").

Analyzing Dr. Poola's Amended Complaint in light of the reasoning in *Twombly* and *Iqbal*, we conclude that it contains sufficient factual allegations to "nudge[] [her] claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. Her allegations went far beyond "an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" *Comer*, 108 A.3d at 371 (internal quotation marks omitted), and the Amended Complaint gives the defendants notice of what her case is about. She alleged that she is a South Asian woman; that (just before the limitations period), at Dr. Taylor's instance, she was denied re-appointment to the Department of Surgery and denied appointment to the Biochemistry

Department as a research professor; and that (during the limitations period) Dr. Taylor also initially blocked her appointment to the Physiology Division and, after eventually signing off on a temporary appointment, denied her access to laboratory and offices at the University to continue her research, all out of discriminatory animus (an intent to "derail[] the career of a non-African-American female and to prevent her professional accomplishments from eclipsing [his] own and those of African American and male faculty"). Dr. Poola further alleged that a culture of discrimination against non-African Americans and women at the University was behind not only her complained-of treatment, but also the harassment, demotion, or removal of other named, similarly situated women employees of the University. She alleged that appellees "never took the same or similar action against African Americans or males."

Of particular importance, the Amended Complaint alleges in addition that Dr. Poola is a world-renowned researcher, that she has taught at prestigious institutions, published in prestigious medical journals, and spoken at numerous medical conferences, and that she repeatedly brought to the University grant funds from which her salary was paid (thus, it appears, not burdening the University's budget and, it may reasonably be assumed, helping to defray University overhead

costs).[6] Dr. Poola alleged that she was expelled from the University when her work under her active grants was continuing (a fact that one can imagine may have cast the University in a bad light with the funding entities), and yet nothing on the face of the Amended Complaint provides a non-discrimination, alternative explanation for Dr. Poola's expulsion.[7] Thus, at the motion to dismiss stage, this was not a case in which, "[a]s between [an] 'obvious alternative explanation' for [Dr. Poola's expulsion] and the purposeful, invidious discrimination [Dr. Poola]

---

[6] *See* 32 C.F.R. § 32.22 (b)(2) (Westlaw, current through September 7, 2016) (DoD regulations governing grants to institutions of higher education, providing for payment of "the proportionate share of any allowable indirect costs" incurred by the institution). Dr. Poola also alleged that the grant funding she brought to the University enabled Dr. Taylor to "siphon[] off" funds "for his own purposes."

[7] We recognize that the summary judgment record contains a document (filed on October 11, 2013) that refers variously to allegations that Dr. Poola "had a track record of being a disruptive" or a "difficult" person and was not a "good [University] citizen." (In fairness, we note that the document also states that its author, apparently a Department Chair, had other "difficult persons in [his] Department" and was willing to "put up with" them "as long as they brought in money.") However, these allegations were not before the court when (on October 16, 2012) it ruled on the motion to dismiss (and, of course, they may or may not have been factors in the decision not to re-appoint Dr. Poola and to deny her access to her former laboratory and office).

The record did contain the foregoing document at the time (July 2014) the court denied Dr. Poola's motion to reconsider the dismissal of her DCHRA claims, but even if at that point he had been permitted to consider the allegations about Dr. Poola being "disruptive" or "difficult," the question was not whether Dr. Poola was "*likely* to prevail, but whether [her] well-pleaded factual allegations *plausibly* g[a]ve rise to an inference of unlawful discrimination[.]" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

asks us to infer, discrimination is not a plausible conclusion," *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567); *see also AFSCME Local 2401 v. District of Columbia*, 796 F. Supp. 2d 136, 141 (D.D.C. 2011) (denying the District's motion to dismiss a complaint alleging racial and age discrimination because "the [c]ourt cannot identify an obvious alternative explanation for the alleged conduct that would render an inference of discrimination implausible" (internal quotation marks omitted)).  Dr. Poola plausibly alleges that appellees behaved toward her as she claims "because of, not merely in spite of," the adverse effects for her career. *Iqbal*, 556 U.S. at 677 (internal quotation marks omitted).

Although some of Dr. Poola's allegations about the alleged culture of discrimination were vague as to date or time period, or plainly occurred outside the limitations period, her allegations nevertheless provide context and "factual enhancement," *Twombly*, 550 U.S. at 557, to her timely allegations.[8]  Her

---

[8]  It is well-established (and the court expressly recognized) that conduct outside the limitations period may be considered as context for evaluating the plausibility of non-time-barred claims. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) ("We also hold that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."); *see also Sepúlveda-Villarini v. Department of Educ. of Puerto Rico*, 628 F.3d 25, 29 (1st Cir. 2010) ("The make-or-break [pleading] standard . . . is that the *combined allegations*, taken as true, must state a plausible, not a merely

(continued…)

allegations may or may not actually be true, but taken as true, they provide a reason to believe — they support a plausible inference — that she was expelled from the University because of her gender, race, and national origin. We thus are satisfied that Dr. Poola pled "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" discriminatory motives for the adverse employment actions against her. *Id.* at 556; *see also Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 (9th Cir. 2012) (holding that the plaintiff alleged an "entirely plausible scenario" of employment discrimination where her complaint alleged that she "was over forty and received consistently good performance reviews, but was nevertheless terminated from employment while younger workers in the same position kept their jobs" (internal quotation marks omitted)).[9]

---

(…continued)

conceivable, case for relief.") (emphasis added); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) ("[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.").

[9] *See also McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011) ("The required level of factual specificity rises with the complexity of the claim."); *Ndzerre v. Washington Metro. Area Transit Auth.*, No. 15-1229, 2016 WL 1225599, *5 (D.D.C. Mar. 22, 2016) ("[O]ur Circuit Court has long recognized the ease with which a plaintiff alleging employment discrimination can survive a motion to dismiss under Rule 12(b)(6)."); *cf. Hamid v. John Jay Col. of Crim. Justice*, No. 99-Civ-8669 WK, 2000 WL 666344, *4 (S.D.N.Y. May 19, 2000) (pre-*Twombly/Iqbal* decision denying motion to dismiss employment discrimination count for failure to state a claim where "[r]eading the complaint expansively, . . . plaintiff accuses defendants of holding to a 'traditional' academic

(continued…)

We also are satisfied that Dr. Poola sufficiently pled a nexus between the adverse employment actions and the alleged discriminatory motives. In that regard, the decision by the Seventh Circuit in *Swanson v. Citibank, N.A.*, 614 F.3d 400 (7th Cir. 2010), is instructive. The Seventh Circuit squarely rejected the notion that *Twombly* and *Iqbal* require a connect-all-the-dots approach at the pleadings stage. *See* 614 F.3d at 404-05. The case pertained to alleged discrimination in violation of the Fair Housing Act, not to employment discrimination, but the court explained its reasoning by using an analogy positing an employment-discrimination complaint:

> A plaintiff who believes that she has been passed over for a promotion because of her sex will be able to plead that she was employed by Company X, that a promotion was offered, that she applied and was qualified for it, and that the job went to someone else. That is an entirely

---

(…continued)

alignment infected with racism," that allegedly led the college to remove him as the principal investigator on a research grant; stating that "[t]rial courts should be cautious about granting summary judgment to an employer [at the very early stage of a lawsuit] where . . . the employer's intent is at issue . . . [and] before plaintiff has had the chance to probe [through discovery] the College's . . . system for making employment decisions that is not amenable to scrutiny and is perhaps infused, at least in part, by illegitimate considerations"); *see generally* William H. J. Hubbard, *A Fresh Look at Plausibility Pleading*, 83 U. CHI. L. REV. 693, 722 (Spring 2016) (observing that with respect to claims such as the "elaborate antitrust claims . . . brought in *Twombly*," "[p]recisely because the plaintiff's theory of the case is fairly complex, plausibility requires a [higher] degree of factual detail" than is necessary to draft a plausible complaint in an employment discrimination case).

> plausible scenario, whether or not it describes what "really" went on in this plaintiff's case. A more complex case involving financial derivatives, or tax fraud that the parties tried hard to conceal, or antitrust violations, will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected.

*Id.*; *see also George v. Roush & Yates Racing Engines, LLC*, No. 5:11CV00025-RLV, 2012 WL 3542633, *4 (W.D.N.C. Aug. 16, 2012) ("It is true, as Defendant suggests, that Plaintiff ultimately bears the burden of showing a connection between the employment action and the alleged [derogatory] remarks," i.e., plaintiff "must produce evidence that clearly indicates . . . a nexus between [a discriminatory attitude at the workplace] and the employment action[,]" but "it is inappropriate to apply [that] summary judgment standard at the pleading stage." (internal quotation marks omitted)); *Vega*, 801 F.3d at 86 ("Because discrimination claims implicate an employer's usually unstated intent and state of mind, rarely is there direct, smoking gun, evidence of discrimination[;] [i]nstead, plaintiffs usually must rely on 'bits and pieces' of information to support an inference of discrimination, i.e., a 'mosaic' of intentional discrimination." (internal quotation marks and citations omitted)).[10]

---

[10] We agree with one commentator that to adopt a more exacting interpretation (such as appellees urge), i.e., to hold that "factual allegations of discriminatory intent must be fully fleshed out and explicitly connected with . . .

(continued…)

Dr. Taylor makes an additional argument as to why the court was correct to dismiss Dr. Poola's DCHRA claim against him: that he was not an employer within the meaning of the DCHRA and therefore cannot be found liable under the statute. We disagree. The DCHRA definition of an "employer" (both currently and at the times relevant to this dispute) includes "any person who, for compensation, employs an individual . . . [and] any person acting in the interest of such employer, directly or indirectly . . . ." D.C. Code § 2-1401.02 (10) (2012 Repl.). An individual may be classified as an employer for purposes of the DCHRA if, for example, he is a manager who "acted in the interest of [the] employer," who either "perpetrated" or "witnessed and failed to stop" alleged discriminatory acts, "or to whom [the employee] complained without success about, the [alleged] discriminatory acts." *Smith v. Café Asia*, 598 F. Supp. 2d 45, 48-49 (D.D.C. 2009).[11] Dr. Poola's Amended Complaint did not specifically

---

(…continued)
the 'adverse employment consequences'" at the motion to dismiss stage, would be "an onerous burden to place on a plaintiff in the first step of litigation and is unwarranted in light of the high value of adjudicating intent-based violations of" the right to be free from invidious discrimination. Tanvir Vahora, *Working Through a Muddled Standard: Pleading Discrimination Cases After Iqbal*, 44 COLUM. J. L. & SOC. PROBS. 235, 261 (2010).

[11] *See also Mitchell v. Amtrak*, 407 F. Supp. 2d 213, 241 (D.D.C. 2005) (observing that allowing a DCHRA claim against individual management and
(continued…)

identify Dr. Taylor's position (as noted above, the summary judgment record indicates that he was Dean of the University's College of Medicine from 2005 through 2011, including at the times Dr. Poola was denied re-appointment and denied access to her laboratory and office), but it did describe his role in deciding to deny Dr. Poola's re-appointment to the Surgery Department ("demand[ing] that Dr. Poola's appointment [to the Biochemistry Department] be denied") and in March 2011, denying the request by the Chair of the Physiology Division for a position for Dr. Poola in that Division. The Amended Complaint also alleged that Dr. Poola sent letters to "the Dean of the College of Medicine" and other University officials stating her concerns about abandoning her active grants and her desire to remain at the University, and that, although Dr. Taylor signed a letter approving a 90-day reappointment of Dr. Poola, "he denied [her] access to the facility." The Amended Complaint thus alleges that Dr. Taylor acted on behalf of the University with respect to her appointment (or denial thereof), that he perpetrated or directed alleged discriminatory acts, and that he was an official to whom Dr. Poola complained without success. For these reasons, the issue of whether Dr. Taylor actually fit the DCHRA definition of "employer" could not be

_____

(…continued)
supervisory employees involved in committing the allegedly discriminatory conduct is consistent with the status of the DCHRA as a remedial statute that "'must be generously construed'").

resolved against Dr. Poola at the pleadings stage, *see Café Asia*, F. Supp. 2d at 49, and therefore the argument appellees raised about his status did not warrant dismissal of Dr. Poola's DCHRA claim against him.

For the foregoing reasons, we agree with Dr. Poola that the court erred in dismissing her DCHRA claims against Dr. Taylor and the University before Dr. Poola had an opportunity to conduct discovery in an effort to prove her claims about adverse employment actions motivated by an unlawfully discriminatory animus.

### III.  The Conversion and Negligence Claims

Dr. Poola next argues that the court erred in entering partial summary judgment for the University on her claims of conversion (Amended Complaint Count IV) and negligence (Count V).  Specifically, she argues that the court erred in concluding that she "had no property interest in physical property deriving from her grant funds" and in concluding that her "research was 'work for hire,'" such that she was "precluded from asserting a property interest in the work."

## A. Background

The following background is pertinent to Dr. Poola's argument. Dr. Poola attached to her Supplemental Opposition to the University's Motion for Partial Summary Judgment a list of property that she claims she was forced to abandon when she was denied access to her former laboratory and offices at the University. Dr. Poola listed the property under three category headings: (i) "Personal property"; (ii) "Property purchased with grants funded for Dr. Poola's research ideas and proposals that were awarded to Dr. Poola as the Principal Investigator" or "Property purchased with grants funds to Dr. Poola as the Principal Investigator for research ideas and proposals prepared by Dr. Poola"; and (iii) "Work Products" (a category in which Dr. Poola included, for example, "biomedical samples," "gene clones," genes and cells "in expression vector stored as freezes," DNA and RNA from "breast cancer cell lines," non-cancerous breast tissues and breast cancer tissues, antibody preparations, research data books, and unpublished research data). In a very abbreviated October 15, 2013, written order, Judge Ross granted the University's motion for partial summary judgment with respect to "any items derived from grant funds." In an April 14, 2014, ruling from the bench, Judge Ross declared that "all that [wa]s left of the case" were Dr. Poola's claims that the University converted and negligently handled items of Dr. Poola's personal

property. He then issued an April 22, 2014, pre-trial order describing the matter for trial as "an action by Dr. Poola for any personal property she left at Howard University at the conclusion of her employment." Thereafter, on October 7, 2014, Dr. Poola dismissed "with prejudice" her "claims set for trial" before Judge Ross, i.e., her claims pertaining to her personal property.

## B. Standard of Review

This court reviews a trial court's grant of a motion for summary judgment *de novo*. *See Steele v. Salb*, 93 A.3d 1277, 1281 (D.C. 2014). Summary judgment is proper where the record shows that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See Hubb v. State Farm Mut. Auto. Ins. Co.*, 85 A.3d 836, 839 (D.C. 2014); Super. Ct. Civ. R. 56 (c). In reviewing a grant of summary judgment, we view the record in the light most favorable to the non-moving party.[12] *See Jaiyeola v. District of Columbia*, 40 A.3d 356, 361 n.9 (D.C. 2012).

---

[12] Here, in reviewing the record in the light most favorable to the non-moving party, we accept Dr. Poola's categorization of the items she claims she was forced to leave behind.

## C. Analysis of the Conversion Claim

## 1. Equipment and Supplies Purchased with Grant Funds

In seeking summary judgment with respect to Dr. Poola's claims based on "items derived from grant funds," the University cited (and its cites again in its brief to this court) Komen documents that identify the University as the "Grantee Institution" and Dr. Poola as the "Principal Investigator," and which state that title to "equipment purchased during the term of a Komen-funded project," while "intended for the use of the [Principal Investigator]," "shall be vested in the Grantee Institution[.]"[13] The Komen documents further provide that "[u]pon completion of the project, all equipment purchased during the term of the Komen-funded project shall remain at the Grantee Institution" (although, with prior written approval from Komen, "in the event of [a Grantee Institution-] approved transfer of a Grant to another institution [upon the Principal Investigator's Change of

---

[13]    Dr. Poola averred that, to the best of her knowledge, the Komen documents, though not all from the time period of the grant under which she was working when she was expelled from the University, are "materially identical" to Komen documents that governed the grant (documents relating to which she asserts were among the possessions to which she was denied access).

Institution Request], the equipment necessary for the continuation and success of the project may be transferred to the new institution").

Addressing Dr. Poola's conversion claim as it pertains to equipment derived from DoD grant funds, the University cited Office of Management and Budget Circular A-110 ("Circular A-110"), which applies generally to all federal agency grants to non-profit organizations (such as the University).[14] Circular A-110 defines a recipient as "an *organization* receiving financial assistance directly from Federal awarding agencies to carry out a project or program" (italics added). It then states that "[t]itle to equipment acquired by a recipient with Federal funds shall vest in the recipient"[15] and likewise that "[t]itle to supplies and other expendable property shall vest in the recipient upon acquisition." "Supplies" is defined to include "all personal property excluding equipment, intangible property,

---

[14] OFFICE OF MGMT. & BUDGET, OMB CIRCULAR NO. A-110, UNIFORM ADMINISTRATIVE REQUIREMENTS FOR GRANTS AND AGREEMENTS WITH INSTITUTIONS OF HIGHER EDUCATION, HOSPITALS, AND OTHER NON-PROFIT ORGANIZATIONS (1999). The University's "Sponsored Program Equipment Management Policy," which is included in the record, incorporates Circular A-110 by reference.

[15] Circular A-110 defines "equipment" as "tangible nonexpendable personal property including exempt property charged directly to the award having a useful life of more than one year and an acquisition cost of $5000 or more per unit." *See also* 32 C.F.R. § 32.2 (Westlaw, through Sept. 1, 2016) (DoD regulation defining "Equipment").

and debt instruments" and certain "inventions of a contractor[.]" Circular A-110 states, however, that "[i]f any statute specifically prescribes policies or specific requirements that differ from the standards provided herein, the provisions of the statute shall govern." Further, DoD regulations governing research grants provide that the DoD regulations shall control to the extent that they are inconsistent with Circular A-110. *See* 32 C.F.R. § 32.3 (Westlaw, through Sept. 1, 2016). Both Circular A-110 and DoD regulations allow the agency to make "deviations" from standard practice. *See* 32 C.F.R. § 32.4 (Westlaw, through Sept. 1, 2016).

The court's comments from the bench during an October 1, 2013, hearing on the University's motion summary judgment reveal why the court entered partial summary judgment in favor of the University on Dr. Poola's conversion claim as it pertains to equipment and supplies purchased with grant funds. At the hearing, the court cited the Komen documents and Circular A-110 and reasoned that under both grant programs, the University, as a Komen "Grantee Institution" and as a DoD grant "recipient," is the owner of any property purchased with Komen or DoD funds.[16] To avoid summary judgment on her claims with respect to the equipment

---

[16] The University asserts that the court's ruling was compelled by this court's decision in *Trustees of the Univ. of the Dist. of Columbia v. Vossoughi*, 963 A.2d 1162 (D.C. 2009), but we believe that *Vossoughi* cannot be read so broadly. We noted in *Vossoughi* that under (unspecified) federal regulations and National

(continued…)

that she acknowledged was purchased with grant funds, Dr. Poola was obligated to come forward with documents or other evidence to prove, as to any equipment to which the University allegedly denied her access and that was purchased with Komen or DoD grant funds (or other grant funds), that she owned (or, arguably, at least had a superior possessory interest in) the equipment.[17]  She "was not entitled

---

(…continued)
Science Foundation ("NSF") policy, the grants under which Dr. Vossoughi, a professor and researcher at the University of the District of Columbia ("UDC"), did research were "awarded to a recipient institution" and "title to grant-funded property vests in the institutional grantee." *Id.* at 1167.  We reasoned that because Dr. Vossoughi "admittedly utilized grant funds (or, conceivably, other university funds) to acquire the articles he purchased from commercial sources while he was at UDC[,]" "UDC would have been entitled to partial judgment as a matter of law [on Dr. Vossoughi's claim of conversion of that property and other related claims] with respect to those . . . purchased articles . . . had it specified them in its Rule 50 motion." *Id.* at 1180.  That premise does not, however, necessarily apply with respect to items purchased with Komen and DoD grant funds (as opposed to the unspecified government agency funds or NSF funds involved in *Vossoughi*).

[17]  The elements of the tort of conversion are "[1] an unlawful exercise, [2] of ownership, dominion, and control, [3] over the personalty of another, [4] in denial or repudiation of his right to such property." *Blanken v. Harris, Upham & Co.*, 359 A.2d 281, 283 (1976) (numerals added).  Thus, to prevail on a claim of conversion with respect to items of property, a plaintiff must have a legal interest in the property. *See Samm v. Martin*, 940 A.2d 138, 141 (D.C. 2007).  Some courts have held that a defendant commits the tort of conversion if he takes "wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." *Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988).

Dr. Poola argues that she applied for and was awarded the Komen and DoD grants, had contractual relationships with the granting agencies, was required to sign amendments to and financial reports about the grants, and had a right to use

(continued…)

to wait until trial to develop" or present the necessary evidence that the equipment purchased with grant funds belonged to her. *See Aziken v. District of Columbia*, 70 A.3d 213, 223 (D.C. 2013) (internal quotation marks omitted). She did not meet her burden; as the University argues, she identified no statute, regulation, guideline or other authority to support her claim of an ownership interest in equipment purchased with Komen or DoD grant funds. She also has not shown that DOD made "deviations" from standard practice, 32 C.F.R. § 32.4. She refers in her brief to "mutually explicit understandings" between the University and herself regarding her entitlement to the *grants*, but has not identified or documented any purported mutual understanding regarding *grant-funded equipment*. We therefore cannot conclude that the court erred in ruling that Dr. Poola did not have an actionable

---

(…continued)
the grant-funded items to perform her research, but none of that is equivalent to a property interest in the equipment purchased with grant funds.

That said, Dr. Poola's claim that she had an ownership interest in at least some of the equipment left in her laboratory and offices at the University is not patently frivolous. According to the Amended Complaint, she had grants from four funding entities in addition to Komen and DoD during her tenure at the University, including other research foundations — entities whose policies with respect to equipment purchased with grant funds are not disclosed in the record. However, in opposing the University's motion for partial summary judgment, Dr. Poola did not specifically assert that she was forced to leave behind equipment purchased with funds from such other foundation grants.

interest in any equipment purchased with Komen or DoD grant funds.[18]  We reach

the same conclusion regarding "supplies and other expendable property" purchased

with DoD grant funds given that Circular A-110 declares that title to the same

"shall vest in the recipient upon acquisition."[19]

---

[18] *Cf. Pemrick v. Stracher*, No. 92-CV-959, 2007 WL 1876504, *12, 13 (E.D.N.Y. June 28, 2007) (stating, in case in which former State University of New York (SUNY) research professor alleged conversion of laboratory equipment, that under applicable federal regulations, "it is clear that title to the equipment purchased with grant funds lies with the [SUNY] Research Foundation" and that "[a]lthough plaintiff argues that she is the owner of the equipment because it was purchased with funds from a [NIH] grant for which she was the Principal Investigator, she offers no legal authority to support her claim of title"); *Abbs v. Sullivan*, 756 F. Supp. 1172, 1182 (W.D. Wis. 1990) (holding that "[a]s to the current grants, [plaintiff university professor] is not the grantee and can claim no property rights in the funding for these [Public Health Service] grants"; rather, "[p]ursuant to [federal regulations], the [university] Board of Regents is the grantee of the awards"), *vacated on jurisdictional grounds*, 963 F.2d 918, 928 (7th Cir. 1992).

As noted above, Komen policy documents contained in the record indicate that if the Principal Investigator transfers to another institution, equipment necessary for the project may be transferred to the new institution.  This provision suggests that the University does not have an outright or irrevocable ownership interest in equipment purchased with Komen funds.  It does not, however, establish that Dr. Poola, who has not shown that she transferred to a new institution, has a superior ownership or possessory claim adequate to support her claim of conversion.

[19] *See ThermoGen, Inc. v. Chou*, No. 98-C-1230, 1998 WL 246395, *2-3 (N.D. Ill. Apr. 30, 1998) (citing HHS regulations that incorporate the provisions of Circular A-110 with respect to title to equipment and supplies and holding that, "[b]y virtue of these regulations and subject to express conditions, ThermoGen [the institutional applicant under a NIH grant] is the sole title holder to all equipment and supplies purchased with the federal grant funds" and that "[t]he terms and

(continued…)

The Komen documents do not address title to supplies purchased with Komen grant funds, but do distinguish "equipment" from "supplies," and thus indicate that not all items purchased with Komen grant funds constitute "equipment" (title to which "vest[s] in the Grantee Institution"). Further, Komen documents contained in the record that pertain specifically to grants for which Dr. Poola was the Principal Investigator indicate that Dr. Poola's budgeted expenditures for "supplies" for the years to which the documents relate far exceeded her budgeted expenditures for "equipment" (which are shown as zero on the documents included in Dr. Poola's Appendix), suggesting that the lion's share of items purchased with Komen grant funds were non-equipment items. As discussed above, the court relied on the Komen and OMB Circular A-110 policies when he broadly removed from the case Dr. Poola's claims with respect to "any items derived from grant funds." It appears, however, that the Komen equipment policy was not an adequate basis for rejecting Dr. Poola's conversion claim insofar as it pertains to *non-equipment* items purchased with Komen grant funds. Also, while Dr. Taylor submitted an affidavit in support of the University's Motion for Partial Summary Judgment in which he averred that, in his 30 years of experience

(…continued)
conditions . . . nowhere suggest that Chou, in her role as principal investigator, takes title to equipment or supplies purchased with federal funds").

working as a Principal Investigator on grants at the University, it was University policy that "any items purchased with grant funds were the property of Howard University" rather than the property of the Principal Investigator, Dr. Poola disputes that bare statement. Thus, there exists a factual dispute about title to the supplies purchased with Komen funds, and we cannot say that the University was entitled to judgment as a matter of law on Dr. Poola's conversion claim insofar as it is based on any such non-equipment items.

## 2. "Work Product"

We also cannot uphold the partial summary judgment ruling with respect to the property that Dr. Poola identified as her "work product" (a category that appears to include items to which she sometimes refers to as her "intellectual property derived from grant funds"). Dr. Poola asserts that the court improperly "concluded that [her] research was 'work for hire'" and that she was "therefore precluded from asserting a property interest in the work."

It actually is not clear on what basis the court excluded Dr. Poola's claims based on her claimed "work product."[20] The court's ruling came during the October 1, 2013 hearing, when the judge stated without explanation that "[w]ork product, . . . anything the professor does is the work product of the institution." He repeated that unexplained ruling during an April 22, 2014, pre-trial conference; referring to what Dr. Poola's counsel called "things that [Dr. Poola] . . . worked on during the grant," the judge said "[a]ll that stuff belongs to Howard University."

Dr. Poola asserts that it is implicit in the judge's ruling that he was persuaded by the University's argument, in its motion for summary judgment, that the items that Dr. Poola designated "work product" fell within the scope of the federal copyright-law doctrine known as the "work made for hire" doctrine.[21]

---

[20] We observe that the record does not support an assumption that all of Dr. Poola's activity in her laboratory was paid for with grant funds. Possibly to the contrary, the Komen documents in the record indicate that Dr. Poola as Principal Investigator was to "provide a 10% minimal level of effort" to work under the grant. The record does not indicate what level of effort was required under the DoD grant.

[21] *See* 17 U.S.C. § 201 (b) (Westlaw through Pub. L. No. 114-219) ("Works Made for Hire. In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."). Citations in the text to sections of the copyright statute are likewise to the Westlaw version, current through Pub. L. No. 114-219.

However, copyright principles apply only where there is an "original work[] of authorship." 17 U.S.C. § 102. The "work product" items Dr. Poola describes include items such as "slides immunostained with various types of antibodies." Such "'useful articles' [as distinguished from any design elements they may have] are not eligible for copyright protection," *Chosun Int'l v. Chrisha Creations, Ltd.*, 413 F.3d 324, 328 (2d Cir. 2005), and thus it is not clear why the judge would have relied on copyright law to dispose entirely of Dr. Poola's claims based on her work product.

Dr. Poola's list of "work product" also includes items such as "research data books" and "unpublished research data." Data compilations may be a "subject matter of copyright," 17 U.S.C. § 103 (a), but only if they entail an organization of data reflecting the author's creative choices about what data to include or exclude and how to arrange them; there is no copyright protection for facts (including scientific facts), information, discoveries, raw data, or wholly factual information not accompanied by any original written expression. *See Feist Publ'ns v. Rural Tel. Serv. Co*., 499 U.S. 340, 344-60 (1991). It is not clear from the record, and the court (if indeed it meant to apply a copyright-law doctrine) did not attempt to sort out, whether Dr. Poola's research data books and unpublished research data constitute compilations that are subject to copyright law — and thus are possibly

subject to the "work made for hire doctrine" — or instead constitute mere raw data, that are not. And, in any event, "[o]wnership of a copyright . . . is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202. As we read Dr. Poola's conversion claim, it is based, at least in part, on loss of the tangible, material objects — e.g., data books — in which her data are embodied; i.e., her claim does not appear to be about who may publish or control publication of the data. Thus, it is not apparent how the copyright work-for-hire doctrine would apply to resolve her claim.

In addition, even if copyright-law doctrines are apposite in this case, the application of copyright law can, as the parties' briefs recognize, involve complicated questions about, and fact-intensive inquiries into, whether work product was generated at the "instance and expense of" the employer, *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000) (stating that for work to be "work made for hire," "the motivating factor in producing the work [must have been] the employer who induced the creation" (internal quotation marks omitted)); and complicated questions about, and fact-intensive inquiries into, the nature and scope of the work relationship and the employer's right to control the manner in which the work is done. *See, e.g.*, *Law Enforcement Training & Research Assoc. v. San Francisco*,

Nos. 90-15482 & 90-15638, 1991 WL 172416, *1-2 (9th Cir. Sept. 4, 1991) (holding "[t]hat [a work] derived from the employment relationship is not sufficient to render the text a 'work for hire,'" and "[t]here is no presumption that a work was created within the scope of an employment relationship"). If the court concluded that Dr. Poola's claimed "work product" belongs to the University, and not to her, on the basis of the copyright "work made for hire" doctrine, it erred in doing so without addressing these complexities and resolving the issues they present.

In the memorandum of points and authorities in support of its motion for partial summary judgment, the University cited the "Howard University Intellectual Property Policy" as another basis for judgment in its favor, asserting that under the policy purportedly set forth in that document, Dr. Poola "had no ownership of any research she may have conducted on [the University's] premises." However, we see in the record no such policy document (and, in its brief to this court, the University has not re-asserted an argument about a "Howard University Intellectual Property Policy").[22] Dr. Poola asserted in her declaration

---

[22] A University document in the record states that "[a]ll equipment at Howard University is managed in accordance with the Materials Management Department's <u>Property and Equipment Management Policy,</u>" but that document

(continued…)

that the University "recognized that [her] research was [her] intellectual property[,]" thus creating an issue of fact that precluded summary judgment on the basis of the University's putative policy. Moreover, it is far from plain that everything Dr. Poola identifies as her "work product" (which, again, includes items such as biomedical samples, gene clones, genes and cells in expression vector stored as freezes, DNA and RNA from breast cancer cell lines, non-cancerous breast tissues and breast cancer tissues, and antibody preparations) constitutes "intellectual property."[23]

It appears that the University may have a right to retain any of Dr. Poola's research data that were generated under the DoD grant if the data resulted in published research findings "that were used by the Federal Government in developing an agency action that has the force and effect of law[.]" Circular A-

---

(…continued)
also is not in the record, so we do not know what it says about management of "Property."

[23] *Cf. Nadal-Ginard v. Children's Hosp. Corp.*, No. 94-3782 E, 1995 WL 1146118, *9 (Mass. Super. Ct. Dec. 1, 1999) (granting summary judgment for the defendant on plaintiff's conversion and negligence claims insofar as they applied to intellectual property, but denying summary judgment on those counts insofar as they were based on plaintiff's allegations that the defendant destroyed "physical property in the form of biological specimens [that were "being kept in a locked freezer"], the record-keeping system relevant to these specimens, and computer disks containing scholarly papers").

110, § __.36 (d)(1). Circular A-110 provides that, as the grant recipient, the University "shall provide" such research data to the federal government if necessary for the government to respond to a Freedom of Information Act request. Circular A-110, § __.36 (d)(2)(i). However, under the Circular, "research data" does not include physical objects such as "laboratory samples." *Id.* The court did not resolve whether and how these provisions apply to the "work product" Dr. Poola claims she was forced to leave behind.

In short, the summary judgment record does not negate as a matter of law Dr. Poola's claim to ownership of the various items she refers to as her "work product." In that regard, the summary judgment record in this case is similar to the trial record in *Vossoughi*, 963 A.2d 1162. Dr. Vossoughi sued UDC for conversion, negligence and trespass to chattels after UDC first directed him to vacate his laboratory because the space was needed for other university programs, and then, without his knowledge, cleaned out the laboratory, destroying property that included scientific instruments and other equipment, voluminous teaching materials developed by Dr. Vossoughi, his unpublished research data, and other items. *Id.* at 1167-72. As discussed *supra* in note 16, this court's opinion acknowledged that according to applicable federal regulations and the evidence presented at trial about the grants that funded Dr. Vossoughi's research at UDC,

"title to grant-funded property vest[ed] in the institutional grantee." *Id.* at 1167. Importantly, however, we observed that "the evidence at trial did not establish that all the property acquired by Dr. Vossoughi at UDC," such as "research data he collected or generated" there, "was derived from grant funds." *Id.* at 1180. We thus recognized the possibility that data collected or generated by a professor in the course of his grant-funded work at a university are not necessarily — i.e., are not as a matter of law — data "derived" from grant funds.

Consistent with our reasoning in *Vossoughi*, we conclude that the University did not establish that it was entitled to judgment as a matter of law on Dr. Poola's claims regarding her "work product," given that all the summary judgment record showed with respect to those items of property is that Dr. Poola collected or generated them while she was employed by the University. For that reason, and all the foregoing reasons, we conclude that the court erred in granting judgment to the University on Dr. Poola's conversion claim insofar as it related to the property she identified as her "work product." A remand and further proceedings are required for the trial court adequately to address Dr. Poola's conversion claim.

## D. Analysis of the Negligence Claim

We reach a similar conclusion as to Dr. Poola's negligence claim. "[A] claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011). To prevail on her negligence claim, Dr. Poola must prove that the University owed her a duty to safeguard the property she allegedly was forced to leave behind. According to a Komen document in the record, as Principal Investigator, Dr. Poola shared with the University "complete responsibility for all aspects of the research, investigation, funding and administration of or in connection with the grant award." At least arguably, this included responsibility to assure that materials used in research under the grant were safeguarded, stored at proper temperatures, protected from tampering, etc., duties Dr. Poola could not fulfill while she (allegedly) was denied access to her laboratory. The court did not specifically consider whether the summary judgment record supported a judgment as a matter of law that the University had no duty to Dr. Poola with respect to property in her former laboratory or offices at the University even if she did not own the property (such as a duty not to interfere unreasonably with her carrying out of her responsibilities to the grant funders), or

that the University fulfilled any such duty. Accordingly, we also cannot uphold the court's ruling summarily dismissing the negligence claim.[24]

## IV. The Protective Order

Dr. Poola raises as her final issue on appeal whether the court "properly granted [the] University's protective order prohibiting [her] from inspecting physical and intellectual property derived from grant funds located at [the] University simply because [he] concluded that she did not have a property interest in the property, despite the property's relevance to her damages and claims of tortious interference and breach of contract." In an April 24, 2013, written order, the court granted the University's motion for a protective order on several grounds: because Dr. Poola proposed a "particularly disruptive 'fishing expedition'" to "inspect and identify 'her property'" (the quotations surrounding "her property" appearing to reflect the court's skepticism about Dr. Poola's claim to ownership);

---

[24] Further, we cannot agree that summary judgment was warranted on the ground, asserted by the University in its motion for protective order and in the parties' Joint Pre-Trial Statement, that Dr. Poola "abandoned her alleged property" by failing to respond to a request by the University in December 2011 that she itemize the property she left behind. Dr. Poola denied having received any such request. The court did not rule on the abandonment claim, which raises factual issues (e.g., about "intent to abandon," *Kearns v. McNeill Bros. Moving & Storage Co.*, 509 A.2d 1132, 1136 (D.C. 1986)) that cannot be resolved in this appeal.

because Dr. Poola "fails to identify what she seeks"; because Dr. Poola did not explain why other methods of discovery, "such as asking the Defendant to produce photographs of the yet to be identified items [would not suffice]"; and because two years had passed since Dr. Poola's termination, she did not challenge the University's assertion that the premises were occupied and operational, and there was "little reason to believe that [the items of property] would be in the same condition today as they were when Plaintiff left or that they would contain the same property." Dr. Poola filed a motion asking the court to reconsider its ruling and explained to the court during a hearing on that motion that, as part of her Super. Ct. Civ. R. 26 (a) discovery in the case, Dr. Poola needed to have an expert inspect the condition of the property in order to assess the value of the items of which she had been deprived.

"[A] trial court discovery order . . . will be disturbed only for an abuse of discretion." *Kay v. Pick*, 711 A.2d 1251, 1256 (D.C. 1998). We have observed that "[i]t is a rare circumstance where we find an abuse of discretion in the context of discovery disputes because we are appropriately reluctant to substitute our judgment for that of the trial court." *Featherson v. Education Diagnostic Inst., Inc.*, 933 A.2d 335, 338 (D.C. 2007). "Nevertheless, this court has found that a trial court abuses its discretion where the trial court's ruling on a discovery matter

is based on erroneous legal reasoning or mistake of fact." *Id.* We conclude that such was the case here.

The court cited a number of factors as its initial basis for granting the protective order, and, in denying the motion to reconsider on October 15, 2013, explained that his ruling was based on the "entire record, including the comments of the Court in open Court on the record at two hearings to consider this issue." The court's colloquy with counsel during the October 13, 2013, hearing reveals a portion of his rationale. The court understood that Dr. Poola sought the inspection in order to "go through [the University's] premises to determine what's [her] property" and commented that, in alleging conversion, she should "know[] what [her] property is."[25] The court scoffed at counsel's explanation that Dr. Poola needed to have an expert "see the condition of the property [including "work product"] and [determine] whether it's deteriorated some or whether it's even usable[,]" in order to "assess the value of [the] property [of which] she's been deprived" (telling Dr. Poola's counsel that his argument was "just filibuster").

---

[25] The court's comment was not entirely unwarranted because, in her written opposition to the University's protective order motion, Dr. Poola did say that the purpose of the inspection she sought was both to "determine the ownership of the property" and "to reasonably calculate Plaintiffs' losses and damages."

The court was correct in implicitly recognizing in its written order granting the protective order that it was required, in exercising discretion, to balance Dr. Poola's need for the requested inspection against the burden to the University. *See* Super. Ct. Civ. R. 26 (c); *see also Belcher v. Bassett Furniture Indus.*, 588 F.2d 904, 908 (4th Cir. 1978). But it appears that the court failed to recognize that in a case such as this where the condition of the property held by the defendant is in issue (Dr. Poola alleged, *inter alia*, that the University "failed . . . to safeguard" the property she left behind when she was locked out of her laboratory and offices, and she sought damages representing the value of the lost or deteriorated items), an inspection of the property may be warranted. Given that apparent misapprehension, as well as the court's too-hasty declaration that all of Dr. Poola's claimed "work product" belongs to the University,[26] we are persuaded that the court did not appropriately exercise its discretion when it granted the protective order. That is especially true in light of the fact that the University filed a July 12, 2013, praecipe and affidavit acknowledging that it had in its possession in specified laboratory rooms (and also listing) many of the items that Dr. Poola included on the list of property she attached to her responses to the University's

---

[26] We note that during the hearing on the University's motion for partial summary judgment, Dr. Poola's counsel expressed concern that the court was attempting to "rush through this motion" rather than giving the parties "enough time to thoroughly hash out these issues."

interrogatories (and that she included again on the categorized list of items she filed on October 11, 2013). In addition, we are skeptical about whether the court had an adequate basis for assuming that it would have sufficed to have the University produce photographs of the items (some of which may be microscopic) or that at least some of the property (e.g., "work product" items that Dr. Poola allegedly stored in a "-80C freezer") would not be in the "same condition today as they were when Plaintiff left[.]" For these reasons, we vacate the order granting the protective order and instruct the trial court to reconsider the motion for protective order in light of this opinion and the circumstances as they exist upon the remand that we order.

**V.**

For the foregoing reasons, we uphold the trial court's rulings granting the motion to dismiss Dr. Poola's DCHRA claims against Dr. Frederick and Dr. Cornwell, but reverse the judgment dismissing her DCHRA claims against Dr. Taylor and the University. We uphold the partial summary judgment ruling insofar as it pertains to Dr. Poola's claim that the University converted equipment purchased with Komen or DoD grant funds, or supplies and other expendable property purchased with DoD grant funds. We reverse the grant of partial

summary judgment in favor of the University on Dr. Poola's conversion claim insofar as the claim relates to non-equipment items purchased with Komen funds or to items that Dr. Poola has designated as her "work product." We reverse the grant of summary judgment as to Dr. Poola's negligence claim. We remand the matter of the protective order for further proceedings consistent with this opinion.


*So ordered.*